Aristedes A. DAY et al., Plaintiffs,

v.

TRANS WORLD AIRLINES, INC.,
Defendant.

Kate KERSEN, Individually and as Administratrix and Administratrix Ad Prosequendum of the Estate of Elbert Kersen, Deceased, Plaintiff,

v.

TRANS WORLD AIRLINES, INC.,
Defendant.

John SPIRIDAKIS et al., Plaintiffs,

v.

TRANS WORLD AIRLINES, INC.,
Defendant.

Nos. 73 Civ. 4105–CLB, 74 Civ. 3355–CLB and 74 Civ. 4191–CLB.

United States District Court,
S. D. New York.

March 31, 1975.

W. Hubert Plummer, Nicolas Liakas, Rogers Hoge & Hills, Milton G. Sincoff, Alan J. Konigsberg, Kreindler & Krein-dler, Fred Ehrlich, Brown, Hurwitz, Seidman, Ehrlich & Zasky, New York City, for plaintiffs.

Paul G. Pennoyer, Jr., John N. Romans, Charles K. O'Neill, Chadbourne, Parke, Whiteside & Wolff, New York City, for defendant.

## MEMORANDUM DECISION

BRIEANT, District Judge.

These actions are brought by plaintiffs, international passengers on defendant airline ("TWA") to recover damages for personal injuries sustained during a terrorist attack in the transit lounge at Hellenikon Airport, Athens, Greece on August 5, 1973. Plaintiffs allege, *inter alia*, liability without fault under the provisions of the Warsaw Convention, 49 Stat. 3000 et seq. (1934), as modified in accordance with the Montreal Agreement (1966). Plaintiffs moved pursuant to Rule 56, F.R.Civ.P. for summary judgment on the issue of absolute liability.[1] Defendants also moved for summary judgment on that issue of liability, and oppose plaintiffs' motion.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

There is no genuine issue with respect to the following facts. The United States and Greece are adherents to the Warsaw Convention, and TWA is a signatory to the Montreal Agreement. TWA is a common carrier engaged in transporting passengers between New York, New York and Athens, Greece.

Plaintiffs, or those in whose right they sue, were passengers in international transportation as defined by Warsaw [Article 1(2)] and ticketholders on TWA's Flight 881/5, scheduled to depart Athens at 3:30 P.M. Athens time.[2]

On August 5, 1973, at approximately 3:00 P.M. Athens time, passengers for

1. There are pendent claims pleaded charging negligence or similar theories, apparently having little factual basis. The airport was not owned or controlled by TWA, but by the Greek Government, which made it available to other airlines equally.

2. Hereinafter, for convenience, we use the term "plaintiffs" to mean "injured passengers" in the context of this case.

TWA Flight 881/5, bound for New York, were assembled in the transit lounge of Hellenikon Airport in the vicinity of Gate 4 and were lining up for the hand baggage check and physical search conducted by the local Greek police prior to boarding. At 3:10 P.M., after approximately seven passengers had been screened and had passed through Gate 4 to buses which would transport passengers for this flight to the TWA airplane that was parked on the traffic apron, two or more terrorists commenced a violent attack on the passengers and others in the transit lounge. The terrorists threw three grenades in rapid succession which exploded in the vicinity of the lines of passengers which had formed for final processing for boarding the TWA flight. They followed this with several gunshots fired into the crowd at random. The terrorists took up a position behind a bar in the transit lounge and held 32 people as hostages. At approximately 5:20 P.M., after lengthy, tense and strident negotiations with the local officials, the terrorists surrendered and were arrested. The toll of this afternoon of terror: approximately 40 TWA passengers wounded; two TWA passengers died immediately and a third died several days later; a passenger of another airline died immediately; four TWA employees were injured; and an undetermined number of passengers and employees of other airlines were wounded.

Subsequent investigation revealed that the perpetrators were two members of the "Black September" organization, Shafik El Arid, also known as Mohamed Zehod, age 21, a native of Jordan, and Talaat Khantouran, also known as Hussein Talaat, age 21, also a native of Jordan. They were not TWA passengers. Following the all too common scenario for such incidents, in their negotiations following the attack, the terrorists sought an aircraft to take them to a "friendly country" and threatened to kill the hostages absent instant gratification. In later statements to the police and at their arraignment, the terrorists admitted that they planned to attack "Israel immigrant passengers on TWA flights going to Tel Aviv but by mistake struck when [these other] passengers were actually boarding the New York bound flight." They conceded their membership in the Black September terrorist organization and that they were acting pursuant to the instructions of that group.

Regardless of their stated purpose, an obvious goal of this frightful conduct is to seek international publicity at the expense of innocent victims unknown to the organization. The passengers on Flight 881/5 were for the most part United States citizens who had been vacationing in Greece.

The flight ultimately departed carrying only seven passengers who had completed their clearance before the incident, and were available, when the local police released the aircraft at 5:30 P.M. Athens time; this out of 82 passengers, including the plaintiffs, who had checked in for the flight.

Prior to the incident, plaintiffs, individually, had presented their tickets at the TWA checking desk located on the upper level of Hellenikon Airport. There, a TWA agent processed their tickets, issued boarding passes, assigned seats by number and issued baggage checks. Pursuant to TWA's instructions, plaintiffs proceeded through passport and currency control, also on the upper level, and thereafter to the transit lounge on the lower or field level to await the search of their persons and carry-on luggage. Once a passenger is in the lounge he may not leave that area unless he again clears passport and currency control on the upper level.

Before the incident, TWA announced that Flight 881 was ready for departure. Plaintiffs were told by TWA personnel to form a line at Gate 4 for the searches abovementioned. Plaintiffs along with the other passengers were then to proceed through the lounge to a bus, owned and operated by Olympic Airways,

which was to take them approximately 100 yards across the traffic apron to their plane.[3]

Plaintiff Helen Rose had passed through the search area when the attack occurred. Aristedes and Constantine Day, escorted by a TWA passenger relations agent were told to proceed with this agent to the plane just before the incident took place. All other plaintiffs at Gate 4 were standing in line to be searched. In the Court's view of the case, these minor differences are not outcome determinative. The issue as to any plaintiff is not where his feet were planted when the killing began, but rather, in what activity was he engaged.

Article 17 of the Warsaw Convention provides that:

> "[t]he carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger if the accident which caused the damage so sustained took place on board the aircraft or *in the course of any of the operations of embarking* or disembarking." (Emphasis added)

■ TWA's position on this motion is that when the attack occurred plaintiffs were not "in the course of any of the operations of embarking", as that phrase is understood under the Convention, and therefore, as a matter of law, TWA is not liable. That the terrorist activities in the circumstances of this case constituted an "accident" is not disputed. The precise meaning of the terms of a statute or treaty is a question of law. See generally Rosman v. Trans World Airlines, Inc., 34 N.Y.2d 385, 392, 358 N.Y.S.2d 97, 314 N.E.2d 848 (1974) (Warsaw Convention).

The Warsaw Convention, formally known as the Convention for the Unification of Certain Rules Relating to International Transportation by Air, 49 Stat. 3000, T.S. No. 876 (1934), was adopted in 1929 following several international conferences among the aeronautical powers. The industry was in infancy; Lindberg had flown the Atlantic in 1927 and Earhart in 1928. Substantial perils of all kinds were envisoned. Accordingly, capital was difficult to secure for this infant industry, because of the risks of loss attendant upon unlimited tort liability. To remedy this perceived difficulty, a plan to limit liability imposed on an airline for accidents was adopted, as the Warsaw Convention.

The Warsaw Convention "functions to redistribute the costs involved in air transportation." Husserl v. Swiss Air Transport Company, Ltd., 351 F.Supp. 702, 707 (S.D.N.Y.1972), aff'd per curiam, 485 F.2d 1240 (2d Cir. 1973). The carrier is in a position to negotiate with the owner or operator of an international air terminal to develop security mechanisms to protect air travellers from terrorist attack. Airport operators have demonstrated their ability and willingness to adapt to technological innovations made necessary by the high incidence of "skyjackings", and in cooperation with the airlines, similar protections might be developed to protect air passengers while they are on the ground. Airlines are also in a better position to be able to bear the losses incurred as a result of airport violence. Carriers might seek insurance coverage that would distribute the cost over a great number of carriers and, consequently, their passengers. See Pan American World Airways, Inc. v. Aetna Casualty & Surety Co., 368 F.Supp. 1098 (S.D.N.Y.1973), aff'd, 505 F.2d 989 (2d Cir. 1974). The airline industry in the United States is a regulated industry which has relatively uniform tariffs and fares, and, assuredly, such additional costs would be passed along to air passengers. Although the problem of terrorist attack was not anticipated by the drafters of the Convention, it is to be assumed that a treaty designed to deal with the hazards of modern air travel would be sufficiently flexible to encompass this most recent hazard.

---

3. The bus served all airlines, and its operation and control was not that of TWA.

■ The Convention essentially created a presumption of liability on the part of the air carrier for injury or death arising out of international transportation, without proof of fault, subject to certain defenses, and a concomitant limitation of liability to $8,300.00 per passenger. The United States, although not a signatory to the Convention, commenced adherence in 1934 pursuant to presidential proclamation. 1 L. Kreindler, Aviation Accident Law, § 11 (1971 ed.) [4]

■ The Warsaw Convention does not expressly define the terms used in Article 17. The court must look to the ordinary meaning of the treaty's terms. For the ordinary meaning of the relevant phrase "in the course of any of the operations of embarking" we begin with Funk & Wagnalls New Standard Dictionary of the English Language (1949). "Course" is defined as "the act of moving onward or forward in a certain direction;" "operation", as "a course or series of acts to effect a certain purpose;" and "embarking," as "to go aboard a vessel or a boat."

■ A consideration of the plain meaning of the words "in the course of any of the operations of embarking" produces a single conclusion. These passengers could not board the aircraft unless they:

1. presented their tickets to TWA at the checking desk on the upper level;

2. obtained boarding passes from TWA;

3. obtained baggage checks from TWA;

4. obtained an assigned seat number from TWA;

5. passed through passport and currency control imposed by the Greek Government;

6. submitted to a search of their persons for explosives and weapons by Greek police;

7. submitted their carry-on baggage for similar inspection by Greek police;

8. walked through Gate 4 to Olympic's bus;

9. boarded the bus;

10. rode in the bus a distance of 100 yards; and

11. walked off the bus and onto the aircraft.

There is simply no other way to "embark," except by these eleven steps. None of these pursuits above-named were being conducted for the personal convenience of the passengers, nor did any of them constitute frolic and detour. When they were injured they had completed five out of eleven steps, each absolutely essential. Without any one, a passenger could not "embark" upon the aircraft.

Of course, when the Convention was drafted, we lived in a simpler day. Many airlines required nothing more than to weigh the passenger and his luggage, take his ticket and allow him to place his foot on the boarding ladder. The plain meaning of the treaty must be adaptable to the practical exigencies of air travel in these parlous times. Regardless of whose real estate he was standing on at the time of the terrorist

4. The Hague Protocol proposed and signed in 1955 which amended the Warsaw Convention was never ratified by the United States. The United States determined later that the $8,300.00 limit imposed by the Convention was insufficient, and on November 15, 1965 the United States filed articles of denunciation of the Convention to become effective within six months. On May 14, 1966, the United States withdrew its notice of denunciation and announced its approval of an interim agreement, known as the "Montreal Agreement." Under this agreement, parties thereto would include in their tariffs to be filed with the Civil Aeronautics Board a special contract by which the carrier would waive those defenses provided by Article 20(1) of Warsaw and increase its limitation of liability under Warsaw to $75,000.00. It is important to emphasize that the Montreal Agreement did not in any way change the text of the Warsaw Convention. See generally, Lowenfeld & Mendelsohn, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497 (1967).

attack, under the circumstances of this case, any person who had accomplished as many as five out of the above mentioned eleven essential acts without which it would be impossible to travel on the flight, within an uninterrupted time sequence, and was perforce lined up to perform the balance of the required acts sequentially, is within the plain meaning of the clause above quoted. TWA would have refused to carry any passenger until he completed substantially all of the above-enumerated acts in the order listed.

■■ Apart from the "plain meaning" test, it is helpful to examine the underlying purpose of the Convention and to interpret its provisions to effectuate that purpose. For this, we may look to the diplomatic and legislative history of a treaty to determine its correct interpretation. Choctaw Nation v. United States, 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 (1943); Factor v. Laubenheimer, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933); MacDonald v. Air Canada, 439 F.2d 1402 (1st Cir. 1971). Treaties are to be liberally construed so as to carry out the intention and purpose of the parties. See De-Tenorio v. McGowan, 364 F.Supp. 1051 (S.D.Miss.1973).

The original draft of the Convention contained a single provision concerning carrier liability for passengers, goods and baggage. As initially drafted, carrier liability extended from the time the passengers, goods and baggage entered the airport of departure until they departed from the airport of arrival. There was no disagreement concerning these proposals insofar as they related to goods and baggage; however, the delegates declined to impose such extensive carrier liability for passengers. Thus a logical distinction appeared between passengers and property. Article 17 was drafted to reflect a more limited approach to the protection of passengers. Because passengers have volition, and can get themselves into situations of peril which inanimate articles such as goods and baggage cannot do, liability should be limited to those times when a passenger is exposed to the dangers of aviation. Although most accidents occur while passengers are on board the aircraft, it is obvious that a passenger may be exposed to certain risks inherent in aviation before he actually boards the plane, and after he has left the plane. It was a reasonable structure to provide by Article 17 that carrier liability be extended to accidents which take "place on board the aircraft or in the course of any of the operations of embarking or disembarking." Sullivan, Codification of Air Carrier Liability by International Convention, 7 J. of Air Law 1, 18–22 (1936).

Under modern conditions of international air travel, the period between the moment a passenger enters the airport until he is safely aboard the aircraft often comprises a substantial amount of time and effort, much of which may be said reasonably to constitute embarking. The Convention rejected liability for passenger injury during this entire period. Instead, it established a test, based on a purposeful activity, "embarking". Occasionally, it may be unclear when liability was to attach; no clear line was drawn, as could have, perhaps been done. However, "the great body of law consists in drawing such lines, yet when you realize that you are dealing with a matter of degree you must realize that reasonable men may differ widely as to the place where the line should fall." Schlesinger v. Wisconsin, 270 U. S. 230, 241, 46 S.Ct. 260, 262, 70 L.Ed. 557 (1926) (Holmes, J. dissenting).

■ This Court should not attempt to draw such a line or formulate an inflexible rule regarding air carrier liability which will apply every time an airport is bombed by criminals. We restrict ourselves to the totality of the circumstances affecting these plaintiffs, viewed against the background of the plain meaning of the Convention, coupled with a consideration of its historical purpose.

We distinguish readily the case of Felismina v. Trans World Airlines, Inc.,

13 Av.Cas. 17,145 (S.D.N.Y. June 28, 1974), which involves a claimed *disembarking*. A passenger who has left the aircraft, unlike plaintiffs is not herded in lines, and has few activities if any, which the air carrier *requires* him to perform at all, or in any specific sequence as a condition of completing his journey. The plaintiff in *Felismina, supra,* was not standing in line in connection with disembarking, and was not performing any acts required by the airline as a condition of travel. She was injured on equipment negligently maintained by third parties.

■ Although the instant motion is directed at the liability imposed by international treaty, principles of common law tort liability are instructive for purposes of comparison. Stated broadly, "[a] common carrier of passengers is not an insurer of the safety of its passengers though it is bound to use a high degree of care for their safety." Nieves v. Manhattan and Bronx Surface Transit Operating Authority, 31 A.D.2d 359, 297 N.Y.S.2d 743 (1st Dept. 1969). Under common law principles, the duty of care owed by a common carrier was not limited to the time in which the passenger was actually on board the carrier, and extended to the time spent by the passenger in the carrier's terminal. Furthermore,:

"[t]he duty of a carrier to keep in a safe condition all portions of its platforms and the approaches leading thereto to which the public is reasonably likely to go is extended to impose a similar duty upon a carrier using the station facilities or approaches of another for its own passengers. So imperative is the duty of a carrier to provide a safe means of access to and exit from its terminal grounds that such duty, it is generally held, cannot be delegated to another. In some instances, however, the carrier's lack of control over the defective premises has been held to preclude liability on its part, the accident resulting in injuries not being one which could have

been reasonably foreseen by such carrier." 7 New York Jurisprudencee, Carriers § 333 at 291–92.

■ The carrier's duty to a passenger waiting at his station is not limited to providing a safe structure, "but also requires the exercise of reasonable care to prevent danger from vicious practices of third parties, of which the carrier has knowledge or a reasonable opportunity for knowledge if reasonable care is taken." *Id.* § 332 at 291.

The Court concludes as a matter of law that the aforementioned injuries were incurred as a result of an accident during the course of embarking and are actionable under the Warsaw Convention as supplemented by the Montreal Agreement.

Plaintiffs' motion for summary judgment on the issue of liability is granted; defendant's motion for summary judgment dismissing the claim is denied.

■ This Court recognizes that the issue of liability in these cases is one of first impression. It seems wasteful of the resources of plaintiffs, defendant, and the Court to proceed immediately to a trial of the issues of damages, which undoubtedly could be adjusted by settlement and compromise if the question of liability were resolved with finality. An immediate appeal from the order to be entered may advance materially the ultimate termination of all of the cases above entitled, and three additional cases [Maropis, et al. v. TWA, 73 Civ. 4297–CLB, Koutsovitis, et al. v. TWA, 74 Civ. 612–CLB and Arapogiannis, et al. v. TWA, 74 Civ. 716–CLB] also arising out of the same accident.

If requested by the defendant to do so, the Court will stay all further proceedings in these cases and certify the question for purposes of an interlocutory appeal under 28 U.S.C. § 1292.

Counsel for any party, if so advised, may submit a proposed statement of the question to be certified pursuant to Rule 5, F.R.App.P., which may be set forth in the order determining the motion.