Simone MAUGNIE, Plaintiff-Appellant,

v.

COMPAGNIE NATIONALE AIR FRANCE, Defendant-Appellee.

No. 74–2672.

United States Court of Appeals, Ninth Circuit.

Jan. 19, 1977.

Albert S. Golbert (argued), Los Angeles, Cal., for plaintiff-appellant.

Alexander Cobb (argued), Los Angeles, Cal., for defendant-appellee.

Before DUNIWAY and WALLACE, Circuit Judges, and RICHEY,* District Judge.

RICHEY, District Judge:

On this appeal we are required to interpret the meaning of "disembarking" as used in Article 17 of the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention"),[1] which provides as follows:

Article 17. The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, *if the accident which caused the*

*damage so sustained took place on board the aircraft or in the course of any of the operations of embarking and disembarking* (emphasis added).

Appellant contends that the district court erred in holding that her injury did not occur in the course of disembarking within the meaning of Article 17. Unpersuaded by appellant's arguments, we affirm.

The facts are not in dispute. In 1971 appellant contracted with Air France, an international air carrier, for flight from Los Angeles, California, to Paris, France, where she was to transfer to Swiss Air for flight to Geneva, Switzerland. When appellant reached Paris, she exited from the Air France plane and entered the Orly Airport terminal to make her Swiss Air connection. She proceeded down the only passenger corridor leading from the Air France gate to the main terminal area. In a hallway between the airline gate and the center of the terminal, appellant slipped and fell, incurring the injuries which gave rise to the complaint. On reviewing the facts, the district court concluded that "[s]ince at the time of her accident, plaintiff had deplaned the Air France aircraft, had reached a safe point inside Orly Airport, and had proceeded a substantial distance en route to the Swiss Air departure area, the injuries complained of were not suffered 'on board the aircraft or in the course of any operations of . . . disembarking.' " C.R. 67. The court thereupon dismissed the complaint with prejudice, pursuant to stipulation of counsel.

The parties are in agreement that the Warsaw Convention was applicable to appellant's flight from Los Angeles to Paris. The sole dispute on this appeal is whether appellant's injury is comprehended by Article 17. To arrive at a workable definition of the term "in the course of . . . disembarking" as used in Article 17, we may properly look to the history and

---

* The Honorable Mary Anne Richey, United States District Judge for the District of Arizona, sitting by designation.

1. 49 Stat. 3000 *et seq.* (1934), reprinted at 49 U.S.C. § 1502 Note.

purpose of the Convention and subsequent interpretations thereof. The scope of the Warsaw Convention is a matter of federal law and federal treaty interpretation, and must be determined from an examination of the "four corners of the treaty." *American Trust Co. v. Smyth,* 247 F.2d 149, 153 (9th Cir. 1957); *Husserl v. Swiss Air Transport Co., Ltd.,* 388 F.Supp. 1238, 1249 (S.D. N.Y.1975). Moreover, it is well established that treaty interpretation involves a consideration of legislative history and the intent of the contracting parties. *Choctaw Nation v. United States,* 318 U.S. 423, 431–432, 63 S.Ct. 672, 87 L.Ed. 877 (1943); *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 35–36 (2d Cir. 1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976); *Block v. Compagnie Nationale Air France,* 386 F.2d 323, 336–338 (5th Cir. 1967); *Rosman v. Trans World Airlines, Inc.,* 34 N.Y.2d 385, 392, 358 N.Y.S.2d 97, 314 N.E.2d 848, 854 (1974).[2]

The Convention was drafted in the late 1920's when the international air transportation industry was in its beginning stages. In order to provide a favorable environment for the industry's growth, various sovereignties agreed to create a uniform body of law governing the rights and responsibilities of passengers and air carriers in international air transportation. *See* Lowenfeld and Mendelsohn, *The United States and the Warsaw Convention,* 80 Harv.L.Rev. 497, 499–500 (1967); *Block v. Compagnie Nationale Air France, supra,* at 326–351, and authorities cited therein. The drafters of the treaty proposed to limit liability for injuries caused by air accidents and, as an offset, proposed a presumption of liability on the part of the air carrier. As originally drawn, the Convention established a presumption of liability with a liability limitation of $8,300 per passenger for injuries comprehended by Article 17. *See* Articles 20, 22 and 23.[3]

In 1965 the United States formally denounced the Warsaw Convention because of the low limitation on damages.[4] Notice of denunciation was withdrawn, however, on the signing of the interim Montreal Agreement. The Agreement, approved by the United States through its Civil Aeronautics Board,[5] established an increased liability limit of $75,000 per passenger for international air transport involving a location within the United States. Additionally, the Agreement imposed absolute liability on air

---

**2.** Appellant argues that since jurisdiction in this action is based on diversity of citizenship, the district court should have consulted conflicts rules in interpreting the scope of Article 17. It is true that the Warsaw Convention does not create a cause of action, but merely creates a presumption of liability if the otherwise applicable substantive law provides a claim for relief based on the injury alleged. *Noel v. Linea Aeropostal Venezolana,* 247 F.2d 677 (2d Cir. 1957), *cert. den.* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957); *Komlos v. Compagnie Nationale Air France,* 111 F.Supp. 393 (S.D.N.Y.1952), *rev'd on other grounds,* 209 F.2d 436 (2d Cir. 1953); *Husserl v. Swiss Air Transport Co., Ltd.,* 388 F.Supp. 1238 (S.D. N.Y.1975). Thus, conflicts rules are applicable in determining whether a cause of action exists. *E. g., Husserl, supra.* However, the determination of the scope of the Warsaw Convention is a matter of federal law and federal treaty interpretation. Conflicts principles are not applicable in interpreting the words of the Convention; rather, the meaning of Article 17 should be ascertained from the intention of the drafters and the goals of the Convention. *Husserl, supra: Block v. Compagnie Nationale Air France,* 386 F.2d 323 (5th Cir. 1967).

**3.** Article 20 provides in pertinent part: "(1) The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures."

Article 22 provides in pertinent part: "(1) In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs."

Article 23 provides: "Any provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this convention shall be null and void, but the nullity of any such provision shall not involve the nullity of the whole contract, which shall remain subject to the provisions of this convention."

**4.** Dept. of State Press Release No. 268, Nov. 15, 1965.

**5.** Approved by the Civil Aeronautics Board, May 13, 1966, Order E–23680, 31 Fed.Reg. 7302 (1966).

carriers, thus eliminating the defense of due care set forth in Article 20(1).[6]

Today the Convention functions to protect passengers from the hazards of air travel and also spreads the accident cost of air transportation among all passengers. *Day v. Trans World Airlines, Inc., supra,* 528 F.2d at 36. Taking a broad view of the term "accident," courts generally have extended air carrier liability to include injuries resulting from such modern air hazards as hijacking and terrorist attacks. *Evangelinos v. Trans World Airlines, Inc.,* Civil No. 74–165 (3d Cir., filed May 4, 1976); *Day v. Trans World Airlines, Inc., supra; Husserl v. Swiss Air Transport Co., Ltd.,* 351 F.Supp. 702 (S.D.N.Y.1972), aff'd 485 F.2d 1240 (2d Cir. 1973), *In re Tel Aviv,* 405 F.Supp. 154 (D.P.R.1975); *Burnett v. Trans World Airlines, Inc.,* 368 F.Supp. 1152 (D.N. Mex.1973); *but see Hernandez v. Air France,* 545 F.2d 279, at 284 (1st Cir. 1976). However, the courts have not been uniform in construing "in the course of . . . embarking or disembarking" as used in Article 17, due perhaps to the ambiguous history of the Convention and the changes in air transportation technology since the original drafting.

In construing "disembarking," several courts have interpreted Article 17 as defining Warsaw coverage primarily by location of the passenger. In *MacDonald v. Air Canada,* 439 F.2d 1402 (1st Cir. 1970), upon which the district court herein relied, injuries sustained by a passenger while awaiting her suitcase in defendant airline's baggage area were held to be outside the scope of the Convention. Relying on the ordinary meaning of the words of the treaty, the First Circuit reasoned that the "operation of disembarking has terminated by the time the passenger has descended from the plane by the use of whatever mechanical means have been supplied and has reached a safe point inside the terminal, even though he

may remain in the status of a passenger of the carrier while inside the building." 439 F.2d at 1405.

Additionally, the court noted that the most important purpose of the Convention was to protect air carriers from "the crushing consequences of a catastrophic accident . . . . Neither the economic rationale for liability limits, nor the rationale for the shift in the burden of proof, applies to accidents which are far removed from the operation of the aircraft." 439 F.2d at 1405.

The First Circuit reaffirmed the *MacDonald* decision in *Hernandez v. Air France, supra,* and at the same time indicated its willingness to consider factors other than location of passenger in interpreting Article 17. There the issue was whether Article 17 comprehended passenger injuries incurred in a terrorist attack while passengers were waiting in the baggage retrieval area of the air terminal. Applying the analysis utilized in *Day* and *Evangelinos,* discussed *infra,* the court considered the location of the passengers and, additionally, the nature of the passengers' activity and whether the passengers were under the control of the carrier at the time of injury. The court found that application of those criteria required the conclusion that the *Hernandez* plaintiffs should not recover under the Warsaw Convention.

While recognizing that the "tripartite test of *Day-Evangelinos*" might be useful for close cases, the court preferred an interpretation of Article 17 which placed at least initial emphasis on physical location of the passengers. On reviewing the legislative history of the Convention, the court was persuaded that the Convention delegates intended "embarkation and disembarkation" to mean "essentially the physical activity of entering or exiting from an aircraft." 545 F.2d at 283–284. Moreover, the court was reluctant to expand air carrier

---

**6.** The Montreal Agreement, not a treaty itself but an agreement among the carriers, did not change the text of the Warsaw Convention. Rather, it modified the terms of the Convention with respect to international transportation in-

volving a location in the United States. *See generally* Lowenfeld and Mendelsohn, *The United States and the Warsaw Convention,* 80 Harv.L.Rev. 497 (1967).

liability to cover all acts of in-terminal terrorism, since the risk of such random violence was deemed not a risk inherent in air travel. The court concluded that the process of disembarking was completed by the time the passengers had left the aircraft and its immediate vicinity, were inside the terminal and were no longer acting at the direction of the carrier.

*In re Tel Aviv, supra,* also involved a terrorist attack on passengers who had deplaned and were waiting in the baggage area of the terminal building. Endorsing a test based primarily on physical location of passengers, the district court held that the Convention did not apply. In the court's view, the legislative history of the Convention made clear that the delegates to the Convention intended to exclude from coverage accidents occurring inside an airport terminal building. The court noted that the Warsaw Convention delegates specifically rejected a proposal from the Comité International Technique d'Experts Juridiques Aériens (CITEJA) which would have made the carrier liable from the time travelers, goods, or baggage first enter the airport of departure to the moment when they leave the airport of destination. 405 F.Supp. at 157, citing from Minutes, *Second International Conference on Private Aeronautic Law,* October 4–12, 1929, Warsaw (R. Horner and D. Legrez, transl. 1975) (hereinafter *Minutes*). The court concluded that the *MacDonald* test was appropriate:

> [T]he intent of the Warsaw Conference in rejecting the CITEJA draft and in declining to impose in Article 17 the same extent of carrier liability for passengers as that provided by Article 18 for goods and baggage [7] was clearly to exclude liability as to passengers for accidents which occur after the passenger "has reached a safe point inside the terminal," and "which are far removed from the

operation of the aircraft." (Citation omitted.) 405 F.Supp. at 157.

The court indicated that embarkation and disembarkation might be distinguished for purposes of Article 17, since the embarking passenger must perform certain required acts within the terminal as a condition of completing his journey. In contrast, the disembarking passenger normally "has few activities, if any, which the air carrier requires him to perform" once the passenger has entered the terminal building. At 157 n. 2, quoting from *Day v. Trans World Airlines, Inc.,* 393 F.Supp. 217, 223 (S.D.N.Y.1975). Similarly, other courts have denied Warsaw coverage to in-terminal accidents in the context of disembarkation. *Felismina v. Trans World Airlines, Inc.,* 13 Avi.Cas.17,145 (S.D.N.Y.1974) (injury on escalator leading to lower level of terminal); *Klein v. KLM Royal Dutch Airlines,* 46 A.D.2d 679, 360 N.Y.S.2d 60 (2d Dept. 1974) (injury on baggage conveyor belt inside terminal); *cf. Mache v. Air France,* Rev. Fr. Droit Aérien 343 (Court d'Appel de Rouen 1967), *aff'd* Rev. Fr. Droit Aérien 311 (Cour de Cassation 1970) (injury in customs area off the traffic apron).

On the other hand, the Second and Third Circuits have refused to give a strictly geographical interpretation to the language of Article 17 with respect to "operations of embarking." In *Day v. Trans World Airlines, Inc., supra,* and *Evangelinos v. Trans World Airlines, Inc., supra,* the courts of appeals extended Warsaw coverage to personal injury claims of passengers caught in a terrorist attack in the transit lounge of Hellinkon Airport in Athens, Greece. At the time of the attack, the passengers were standing in line at the departure gate ready to proceed to the aircraft.

In *Day,* the Second Circuit unanimously rejected a "rigid location-based rule" as incompatible with the primary goal of the

---

**7.** Article 18 provides broad coverage for goods and baggage: "(1) The carrier shall be liable for damage sustained in the event of the destruction or loss of, or of damage to, any checked baggage or any goods, if the occurrence which caused the damage so sustained took place during the transportation by air. (2) The trans-

portation by air within the meaning of the preceding paragraph shall comprise the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft, or, in the case of a landing outside an airport, in any place whatsoever."

Warsaw drafters—"to create a system of liability rules that would cover all the hazards of air travel." 528 F.2d at 38.[8] In the court's view, the Montreal Agreement, with its imposition of absolute liability and greatly increased liability limits, demonstrated that protection of the passenger was one of the present-day functions of the Convention. Recognizing that air travel hazards now include terrorism and hijacking and that such perils often spill over into the airline terminal, the court found that injuries resulting from a terrorist attack while passengers were waiting to board were within the scope of Article 17 as modified by the Montreal Agreement.

The court approved of the district court's interpretation of the intended meaning of Article 17. The district judge had rejected the strict location-based formula urged by the airline and had applied instead a tripartite test based on activity (what the plaintiffs were doing), control (at whose direction), and location. *Day v. Trans World Airlines, Inc.,* 393 F.Supp. 217 (S.D.N.Y. 1975).

Similarly, in *Evangelinos, supra,* the Third Circuit in a two-to-one decision, followed the *Day* analysis and rejected the airline's argument that embarkation operations under Article 17 could never occur inside a terminal building. The court reasoned that neither the language of Article 17 nor the delegates' rejection of the CITE-JA draft compelled a conclusion that the draftsmen intended a strict location-based test.

The most that can be said is that the draftsmen rejected the concept of automatic liability for all accidents within the limits of the aerodrome. Our conclusion that under certain circumstances there may be liability for some accidents within a terminal building is not inconsistent with that intent. Slip Op., 9.

The court felt that it was accommodating the principal concerns of those who opposed the CITEJA proposal[9] without going beyond the plain meaning of Article 17 by taking into consideration "the carrier's control over the passengers and the likelihood of injury by causes inherent in air transportation." Slip Op., 9. *See also Husserl v. Swiss Air Transportation Co., Ltd., supra,* 388 F.Supp. at 1245–48, giving a flexible interpretation to the phrase "on board the aircraft" as used in Article 17.

On reviewing the authorities cited to us, we find that a rule based solely on location of passengers is not in keeping with modern air transportation technology and ignores the advent of the mobile boarding corridors utilized by many modern air terminals.[10] Today the expandable boarding units have eliminated to a great extent the need for embarkation and disembarkation outside the terminal building. Thus, determining whether passengers were inside or outside

**8.** The Second Circuit viewed the delegates' rejection of the proposal that carrier liability explicitly cover in-terminal injuries as an indication of the delegates' preference for a flexible approach. The court felt that the most one could infer from the delegates' action was "a reluctance to cover *all* accidents occurring inside a terminal, not a determination that *no* such accidents should be covered." 528 F.2d at 35 n. 12.

**9.** The court noted that the delegates' chief objection to the CITEJA draft was that the proposal would extend carrier liability to injuries incurred when the airline had no control over the passenger. Slip Op., 9 n.12, citing *Minutes* at 73. The court thus reasoned that where passengers were inside the terminal building but within the control of the airline, they were not automatically excluded from the intended scope of the Warsaw Convention. Chief Judge

Seitz, in dissent, urged a more restrictive interpretation of Article 17 which would focus primarily on location of the passenger and secondarily on activity. Under his interpretation, "[o]nly those passengers who have departed from the safety of the terminal and are engaged in the activity of boarding or any of the steps which immediately precede boarding should be granted recovery." Slip Op., 20.

**10.** In construing the scope of the Convention, we may properly consider changes in circumstances subsequent to the drafting of the treaty. *See Block v. Compagnie Nationale Air France,* 386 F.2d 323, 336–337 (5th Cir. 1967); *Eck v. United Arab Airlines,* 15 N.Y.2d 53, 255 N.Y.S.2d 249, 203 N.E.2d 640 (1964); ALI Restatement Second of Foreign Relations Law §§ 147, 153.

the airport terminal at the time of injury should not end the analysis. Further, we note that some commentators have concluded that "control" is the decisive factor. Shawcross and Beaumont, *Air Law* 441–442 (3d Ed.1966); Matte, *Traite de Droit Aerien-Aeronautique,* 404–405 (1964) (cited in *Day,* 528 F.2d at 37 n. 17.)

In short, since the Convention drafters did not draw a clear line, this Court is also reluctant to formulate an inflexible rule. Rather, we prefer an approach which requires an assessment of the total circumstances surrounding a passenger's injuries, viewed against the background of the intended meaning of Article 17. Location of the passenger is but one of several factors to be considered.

■ However, even under the more flexible interpretation of the language of Article 17, appellant's claim does not come within the scope of the Convention. Appellant's situation contrasts sharply with the status of the passengers in *Day* and *Evangelinos.* There the passengers had obtained their boarding passes and were standing in line at the departure gate, waiting to be searched immediately before boarding. On those facts, it was reasonable for the courts to conclude that the travelers were involved in embarkation operations. Appellant, on the other hand, had deplaned and was heading to the Swiss Air gate to make her connecting flight to Geneva at the time of injury. She had proceeded through a boarding lounge and into a common passenger corridor of Orly Airport which was neither owned nor leased by Air France. Furthermore, she was acting at her own direction and was no longer under the "control" of Air France. Under these circumstances, we find that appellant had completed disembarkation operations within the meaning of Article 17.

Judgment affirmed.

WALLACE, Circuit Judge, concurring.

The majority recognizes that application of either the location-of-the-passenger test of *MacDonald v. Air Canada,* 439 F.2d 1402 (1st Cir. 1971), or the tripartite test of *Day v. Trans World Airlines, Inc.,* 528 F.2d 31 (2d Cir. 1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), results in the same disposition: affirmance of the district court's judgment and denial of recovery to plaintiff Maugnie. It is therefore plainly unnecessary in this case to resolve an important question concerning an international treaty. We ought not to be reaching out to do so.

But if choose I must, I would choose the *MacDonald* test. I agree with the district judge that that test is more in keeping with both a fair reading of the language of Article 17 and the Article's historical derivation. *See generally* Note, *Warsaw Convention— Air Carrier Liability for Passenger Injuries Sustained Within a Terminal,* 45 Fordham L.Rev. 369, 370–76, 379–86 (1976). As the First Circuit just recently noted in *Hernandez v. Air France,* 545 F.2d 279 (1st Cir. 1976), *aff'g* 405 F.Supp. 154 (D.P.R.1975):

> We are persuaded that the delegates [to the Warsaw Convention] understood embarkation and disembarkation as essentially the physical activity of entering or exiting from an aircraft, rather than as a broader notion of initiating or ending a trip.

at 283–284. Indeed, all

> courts defining "disembarking" have consistently refused to extend the coverage of the Warsaw Convention to encompass injuries occurring within the terminal. The principle, announced in *MacDonald* and followed by the courts in *Felismina* [*v. Trans World Airlines, Inc.,* 13 Av.Cas. ¶ 17,145 (S.D.N.Y.1974)] and [*In re*] *Tel Aviv* [405 F.Supp. 154 (D.P.R.1975)], created a standard which emphasized the passenger's location, thereby ending liability when the passenger has reached a "safe" point within the terminal.

Note, *supra,* 45 Fordham L.Rev. at 376.

The *Day* test, on the other hand, suffers from several serious flaws. First, the conclusions reached by *Day,* and by *Evangelinos v. Trans World Airlines, Inc.,* No. 75–1990 (3d Cir. May 4, 1976), *motion for rehearing en banc granted* (June 3, 1976), which

follows *Day,* "rest upon a somewhat selective reading of the Warsaw minutes." Note, *supra,* 45 Fordham L.Rev. at 380. In other words, the substantial portions of the legislative history favoring the location test, *see id.* at 380–81, were disregarded.

Second, the *Day* test is bottomed on a social theory of compensation designed to spread the burden of damages from travel to all travelers. By relying on this theory of social engineering, "the *Day* court clearly injected policy arguments alien to the spirit of the Warsaw convention when drafted in 1929." *Id.* at 385. Moreover, it is not possible, in my view, to implement such a theory under the current terms of the Warsaw Convention without such a torturing of language as to constitute a redrafting. The court in *Day,* unfortunately, engaged in such contortions. If the signatories of the Convention wish to redraft it, they may do so, but the courts should not.

Finally, it seems clear to me that the *Day* test was designed to extend a right of recovery to persons for whom sympathy inspires a method of compensation. The *Day* test was meant to be plaintiffs' law. Yet in many cases it may operate to thwart plaintiffs' attempts to recover the full value of their claims. The Warsaw Convention is a two-edged sword: the basis of liability is strict but at the same time the amount recoverable is limited. *See Mache v. Air France,* [1968] D.S.Jur. 515 [1967] Revue Francaise de Droit Aérien 343 (Cour d'Appel, Rouen), *aff'd,* [1971] D.S.Jur. 373, [1970] Revue Francaise de Droit Aérien 311 (Cass. civ. 1re), where the plaintiff-passenger argued against the applicability of the Warsaw Convention in an effort to avoid its ceiling on recovery. Thus, even if it is accepted on its own terms, the *Day* test may have perverse and unintended consequences.

Accordingly, I concur only in the result.