Bennie Imogene DUNN,
Plaintiff-Appellee,

v.

TRANS WORLD AIRLINES, INC.,
Defendant-Appellant.

No. 77–1649.

United States Court of Appeals,
Ninth Circuit.

Sept. 21, 1978.

Rehearing and Rehearing En Banc
Denied Jan. 23, 1979.

Lawrence J. Teker (argued), of Trapp, Gayle, Teker, Hammer, Lacy & Moore, Agana, Guam, for defendant-appellant.

Norman Ashton (argued), of Ferenz, Bramhall, Paul, Nolan, Gruskin, Oakland, Cal., for plaintiff-appellee.

Before CHAMBERS and ANDERSON, Circuit Judges, and KING,* District Judge.

SAMUEL P. KING, District Judge:

Defendant-appellant, Trans World Airlines, Inc. ("TWA"), appeals from a decision by the district court of Guam awarding plaintiff-appellee, Bennie Imogene Dunn ("Dunn"), $75,000 for injuries sustained when the flight on which Dunn was aboard experienced some air turbulence en route

---

* Honorable Samuel P. King, Chief United States District Judge, District of Hawaii, sitting by designation.

from Honolulu to India.[1] Four issues are raised on appeal by TWA:

1. The district court erred in awarding Dunn judgment in the amount of $75,000 since the Treaty of Warsaw,[2] otherwise known as the Warsaw Convention, limited recovery for such injuries to approximately $8300.[3] The Montreal Agreement,[4] which modified the Treaty of Warsaw's limitation and provided, instead, a limit of $75,000 on recoveries against signatory airlines, was inapplicable to the instant case because plaintiff failed to "allege, plead or prove that TWA was a signatory to such an agreement; plaintiff did not allege, plead or prove that she was entitled to the provisions of the Montreal Interim Agreement, and therefore her damages, if any, are limited to $8,300.00 under the Warsaw Treaty." Appellant: Opening Brief at 6.

2. The award of $75,000 in favor of Dunn was excessive in that there was insufficient evidence to support such a finding.

3. The district judge should have found Dunn contributorily negligent in not having her seatbelt fastened at the time of the turbulence.

4. The district judge erred in not dismissing the complaint or imposing other sanctions for Dunn's counsel's failure to produce her x-rays pursuant to TWA's Request to Produce.

I. TWA's first contention is that since plaintiff failed to either allege, plead or prove that the airline was a signatory to the Montreal Agreement or that she was entitled to the provisions of that Agreement, her damages, if any, are limited to $8300 under the Warsaw Convention. During oral argument on appeal, counsel for TWA admitted that the airline was in fact a signatory to the Agreement.

In response, plaintiff argues that the Montreal Agreement creates no new cause of action, but functions simply as an affirmative defense and, therefore, need be neither pleaded nor proved by the complainant. Further, since all parties, as well as the district judge, were aware of the applicability of the Agreement to the case at the time of trial, any objection to it was either implicitly waived by the airline or rejected by the trial judge.

The Warsaw Convention is officially entitled "Convention for the Unification of Certain Rules Relating to International Transportation by Air," declaration of adherence by the United States deposited at Warsaw, Poland, July 31, 1934, proclaimed October 29, 1934. In essence, the Convention creates both a presumption of liability on the part of the carrier for injury or death arising out of international transportation (subject to certain defenses), and a concomitant limitation of liability (subject to certain exceptions) to 125,000 Poincare francs per passenger. *Husserl v. Swiss Air Transport Co.*, 351 F.Supp. 702, 703 n.1, (S.D.N.Y.1972), *aff'd* 485 F.2d 1240 (2d Cir. 1973).

The Convention was drafted during a period when international air travel was in its infancy. The problem facing most international air carriers at that time was the securing of capital in the face of what appeared to be enormous hazards and risks. 1 L. Kreindler, Aviation Accident Law, § 11.01(2). "In the absence of a limitation on liability one disaster might [have swept] away a large capital investment." *Id.* Hence, in order to provide a more favorable

---

**1.** Dunn purchased an airplane ticket with TWA to fly to Hong Kong from Honolulu. She boarded Flight No. 743 in Honolulu on or about November 13, 1971. Approximately five hours out of Honolulu, and about another hour before reaching Guam, plaintiff was injured when the plane experienced some air turbulence. Transcript at 15 and 354.

**2.** 49 Stat. 3000, T.S. 876; 49 U.S.C.A. § 1502.

**3.** During oral arguments on appeal, counsel for TWA indicated to the court that the limitation under the Warsaw Convention is now approximately $10,000 due to recent shifts in the world monetary structure. For purposes of this opinion, however, we will continue to refer to the $8300 figure since that is the figure used by the parties in their briefs.

**4.** Reported in Civil Aeronautics Board Order No. E–23680, 31 Fed.Reg. 7302 (1966); the Order is also set forth at 49 U.S.C.A. § 1502.

environment for the industry's growth, various sovereignties agreed to create a uniform body of law governing the rights and liabilities of passengers and air carriers in international air transportation. *See* Lowenfeld & Mendelsohn, 80 Harv.L.Rev. 497, 499–500 (1967); *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 326–51 (5th Cir. 1967), *cert. denied* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). The drafters of the treaty proposed to limit liability for injuries caused by air accidents and, as an offset, proposed a presumption of liability on the part of the air carrier. As originally drawn, the Convention established a presumption of liability limitation of [$8300] per passenger for injuries comprehended by Article 17 of the Convention. *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256 (9th Cir. 1977), *cert. denied* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977).

Nevertheless, on November 15, 1965, the United States filed a formal Notice of Denunciation of the Convention with the Polish Government, to become effective May 15, 1966. The reason for the denunciation was what the United States considered the unconscionably low limits on liability for death and injury under the Convention. The press release announcing the denunciation provided:

> The United States would be prepared to withdraw the notice of denunciation deposited today if prior to its effective date of May 15, 1966, there is a reasonable prospect of an international agreement on limits of liability in international air transportation in the area of $100,000 per passenger or on uniform rules but without any limit of liability, and if, pending the effectiveness of such international agreement, there is a provisional arrangement among the principal international airlines waiving the limits of liability up to $75,000 per passenger. Dep't of State Press Release No. 268, 50 Dep't State Bull. 923, 924 (1965).

The United States withdrew its denunciation of May 14, 1966, and, instead, approved, through the Civil Aeronautics Board, an interim agreement submitted by the International Air Transportation Association (IATA). Dep't of State Press Release Nos. 110, 111; 54 Dep't State Bull. 955 (1966). This interim arrangement, known as Agreement CAB 18900, provided that the parties thereto would agree to include in their tariffs to be filed with the CAB a "special contract" by which the carrier would waive its defenses provided by Article 20(1) of the Warsaw Convention and also its limitation of liability under the Convention up to $75,000. *Husserl v. Swiss Air Transport Co.*, 351 F.Supp. at 703 n.1.

Together, the Agreement, signed by each airline, the tariff, filed pursuant to the Agreement on May 16, 1966, the Notice to Passengers included within the ticket informing the passenger of the change in the regime of the Warsaw Convention, and the CAB order, constitute what has popularly been known as the "Montreal Agreement". *Id.*

With respect to the Warsaw Convention itself, the majority of courts have in the past adhered to the proposition that no cause of action is created by the Convention. Instead, the Convention was regarded as creating a presumption of liability if the otherwise applicable substantive law provided a claim for relief based on the injury alleged. *Maugnie v. Compagnie Nationale Air France*, 549 F.2d at 1258 n.2; *Noel v. Linea Aeropostal Venezolana*, 247 F.2d 677 (2d Cir. 1957), *cert. denied* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957); *Komlos v. Compagnie Nationale Air France*, 111 F.Supp. 393 (S.D.N.Y.1952), *rev'd on other grounds*, 209 F.2d 436 (2d Cir. 1953), *cert. denied* 348 U.S. 820, 75 S.Ct. 31, 99 L.Ed. 646 (1954); *Husserl v. Swiss Air Transport Co.*, 351 F.Supp. 702.

> It might be noted that this proposition is consistent with this court's conclusion that the Convention does not extinguish any cause of action either. In other words, the Convention is neutral with respect to the existence of a cause of action and merely conditions and limits any action which exist under otherwise applicable law. *Husserl v. Swiss Air Transport Co.*, 388 F.Supp. 1238, 1252 (S.D.N.Y.1975).

Since the Montreal Agreement, in large part, merely modified certain terms of the Convention, then arguably the Agreement itself would not independently support a cause of action, as Dunn contends here.

Despite this, TWA asserts that "in pleading a cause of action based upon the Montreal Agreement, one must allege that agreement and prove that the defendant was a party thereto." Appellant's Opening Brief at 7. According to TWA, the Agreement "is merely a contractual provision between certain airlines and the U. S. Government. And because it is a contract, under the basic law of contracts it must be pleaded. In the case at bar, the existence of the contract (the Montreal Agreement) was neither mentioned, pleaded, alleged or proved." *Id.* at 6. In support of its position, TWA cites *Husserl v. Swiss Air Transport Co.*, 351 F.Supp. 702. Reliance on that case, however, is misplaced as the fact that the parties there did not dispute that the defendant carrier had signed the Montreal Agreement did not imply that the Agreement had to be pleaded in order to have it apply. Nevertheless, the law in the Second Circuit has recently undergone some important changes which may support appellant's position.

In *Benjamins v. British European Airways*, 572 F.2d 913 (2d Cir. 1978), the Second Circuit has reversed its prior stand as posited in *Noel* and *Komlos* and has held that the Warsaw Convention does create an independent cause of action.

It is true that in the past we have said that the Warsaw Convention does not create a cause of action. We believe, however, that a re-examination of the question requires a different answer.

. . . . .

We recognize that the holdings in *Komlos* and *Noel* have become the rule not of this circuit alone, but of others as well. *See, e. g., Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1258 (9th Cir.), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). Nonetheless, we are convinced that—in light of both the paucity of analysis that accompanied the creation of the rule and the strong arguments in favor of the opposite rule—the *Komlos/Noel* rule ought no longer to be followed.

. . . . .

We do, on the other hand, believe that the desirability of uniformity in international air law can best be recognized by holding that the Convention, otherwise universally applicable, is also the universal source of a right of action. We do see that uniformity of development can better be achieved by making federal as well as state courts accessible to Convention litigation. 572 F.2d at 916, 919.

Thus, if the Convention is required to be pleaded and proved, then, perhaps, the Montreal Agreement must also be so treated. However, we find that we need not decide at this time whether the *Benjamins* rule should be followed in this circuit. Federal Rule of Civil Procedure 15(b) is dispositive of the controversy.[5]

 Under Rule 15(b), which permits amendments to be made to pleadings to conform to the evidence adduced at trial, an amendment may be made at any time on the motion of any party, even at the appellate level. 3 Moore's Federal Practice, ¶ 15.13[2] (1974) and cases cited therein. In any event, the lack of an amendment will

5. Federal Rule of Civil Procedure 15(b) provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend

is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

not affect a judgment in any way. *Decker v. Korth*, 219 F.2d 732 (10th Cir. 1955). "Failure to formally amend the pleadings will not jeopardize a verdict or judgment based upon competent evidence. If an amendment to the pleadings to conform to the proof should have been made, the Courts of Appeals will presume that it is so made to support the judgment." *Id.* at 739.

Here, despite TWA's contention that "there was no evidence introduced on the [Montreal Agreement]" at trial, we find the contrary to be true. Plaintiff's Trial Memorandum read as follows:

Liability in international air transportation is governed, as to English speaking nations and many others, by rules promulgated in an international treaty known as the "Warsaw Convention" . . particular reference is made to an amendatory agreement between the United States and other countries, effective May 16, 1966, which provides for increased limit of liability for each passenger for death, wounding, or other bodily injury of $75,000 inclusive of legal fees. Record on Appeal at 361–62.

The airline itself raised the issue of the Montreal Agreement in its own Trial Memorandum when it stated, in reference to the $8300 limitation under the Warsaw Convention. "This liability limit may now be as much as $75,000.00 according to the 'Interim Montreal Agreement.'" *Id.* at 381.

Plaintiff's counsel's opening statements at trial also referred to the $75,000 limitation. "And, Your Honor, under the Warsaw Convention, the damages are limited to $75,000.00, and we think after you hear the evidence you will feel justified in awarding the plaintiff the full amount of $75,000.00." Transcript at 12.

Finally, plaintiff's airline ticket, which was introduced into evidence at the trial, also contained a reference to the Montreal Agreement:

For such passengers on a journey to, from, or with an agreed stopping place in the United States of America, the Con-

vention and special contracts of carriage embodied in applicable tariffs provide that the liability of certain carriers parties to such special contracts for death or personal injury to proven damages not to exceed U.S. $75,000 per passenger, and that this liability up to such limit shall not depend on negligence on the part of the carrier.[6]

Hence, even if we were to require that the Agreement be separately pleaded in the complaint as an independent cause of action, Rule 15(b) would nevertheless cure any defect in this regard.

■ Defendant's argument would have this court return to the days when the failure by a plaintiff to formally plead a theory of liability against the defendant at the outset would forever foreclose him from asserting that theory later at trial. The Federal Rules of Civil Procedure were designed, and should be interpreted and applied, to do away with this kind of technicality. The parties were aware of the applicability of the Montreal Agreement, TWA admitted during arguments on appeal that it was a signatory to the Agreement, and the case was tried on the theory that the Montreal Agreement was applicable. Under the circumstances, the failure by Dunn to formally plead the existence of the Agreement does not foreclose her from recovery under that Agreement.

II. Paragraph 10 of the district judge's Conclusions of Law stated:

10. Although the amount of damages which will compensate plaintiff for injuries as a direct result of defendant TWA's negligence (sic), is in excess of $75,-000.00[,] plaintiff is entitled to recover from TWA damages in the sum of $75,-000.00 as a result of limitations on liability imposed by the Warsaw Convention.

Defendant charges that the trial judge's findings concerning Dunn's injuries are unsupported by the evidence in the case. Further, defendant complains that the damages awarded plaintiff are "terribly excessive"

**6.** All carriers signatory to the Montreal Agreement are required to insert this notice on their

tickets for international flights. C.A.B. Order No. E–23680, 31 Fed.Reg. 7302 (1966).

since they are not limited "to the time that the plaintiff was reasonably out of work, which at the maximum would have been six months, and not for the rest of her life." Appellant's Opening Brief at 18.

Under Rule 52(a) of the Federal Rules of Civil Procedure, "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

Upon a review of the record of this case, we do not find that the district judge was clearly erroneous in his assessment of the extent of plaintiff's injuries.

In his Findings of Fact, Judge Duenas found that besides suffering a number of physical ailments arising from the incident,[7] Dunn also incurred medical expenses for hospitalization and doctors' care in the amount of $4300 and lost wages from November 14, 1971, to the date of trial in the sum of $29,000, for a total of $33,300. The balance, then, of approximately $39,700 ($75,000 less $33,300) represented, in Judge Duenas' view, past, present and future pain and suffering, future medical expenses, and future lost wages. Dunn herself testified extensively about the pain she suffered immediately following the accident, during the time she was transported to the hospital in Guam, while in the hospital, while being transported to the hospital in Hawaii, and afterward. She testified that she suffered a reoccurrence of a previously deactivated

duodenal ulcer and an aggravation of her existing osteoporosis and her other back problems. Prior to the incident, she was employed as a department head of a Hawaii newspaper, earning a salary of $1060 per month. She testified that the pain and fatigue associated with her injury forced her eventually to quit this job. In sum, the accident, without doubt, substantially reduced her physical, social and economic activity to a considerable extent.

As an appellate court, we are "bound to view the evidence in the light most favorable to [Dunn] and to give [her] the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." *Continental Ore Co. v. Union Carbide*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). The original trier of fact is also in the best position to survey the evidence and to draw conclusions regarding the credibility of the witnesses. In evaluating such evidence, the trial court's appraisal of the credibility of the witness is to be accepted; no challenge to such appraisal is permitted at the appellate level. *Nuelsen v. Sorensen*, 293 F.2d 454, 460 (9th Cir. 1961).

III. TWA next argues that any injuries that plaintiff sustained were caused by her own negligence in not having her seatbelt fastened when she was not moving about the plane.[8]

In his Findings of Fact, Judge Duenas found:

14. Plaintiff was not instructed by TWA to fasten her seatbelt at a time when the risk to plaintiff from said turbulence was, or with the exercise of reasonable care should have been, apparent to TWA, and prior to the time when plaintiff sustained her injuries.

---

7. More specifically, Paragraph 21 of the lower court's Findings of Fact stated:

 21. As the direct and proximate result of being violently thrown from her seat, plaintiff sustained the following personal injuries: compression fracture of the seventh, ninth and eleventh thoracic vertebrae; aggravation of preexisting back ailments and changes in the thoracic and upper lumbar regions of

plaintiff's back, and reoccurrence of a duodenal ulcer, a gastrointestinal disturbance.

8. Plaintiff was seated at the time the turbulence took place. She testified:

 I was sitting on my seat. I bent over to reach under the seat to get my book, and then, all at once, the body was lifted and held by force of some kind against the top of the airplane. Transcript at 60.

15. As a passenger on flight 743 on or about November 13, 1971, plaintiff exercised ordinary care, caution and prudence to avoid any accident or resulting injuries or damages proximately caused thereby.

There was substantial evidence from the record to support the judge's findings. The evidence showed that the sign warning passengers to fasten their seatbelts was not on at the time of the turbulence. It had been on prior to takeoff, but had been shut off shortly afterwards. The only evidence the airline offered in support of its contention was that all passengers were asked to keep their seatbelts fastened during the flight if they remained in their seats. This announcement was given some five hours prior to the accident. Only after the turbulence started did the seatbelt sign come on again. Further, since it was a night flight and the plane was relatively empty, the passengers were encouraged to lie down across adjoining seats to rest.

The district judge was not clearly erroneous in his finding that plaintiff was not contributorily negligent in not having her seatbelt fastened at the time of the turbulence.

IV. Finally, TWA contends that the district judge erred in not dismissing the complaint or imposing other sanctions for plaintiff's failure to produce plaintiff's x-rays pursuant to defendant's Request to Produce.

On December 19, 1974, plaintiff requested, pursuant to Federal Rule of Civil Procedure 34, all medical records of plaintiff, including her x-rays, which were in the custody of the records librarian at Kaiser Hospital, Honolulu, Hawaii. By letter dated January 17, 1975, defendant was informed that the records at Kaiser were destroyed. On the first day of the trial, January 20, 1975, TWA requested that the trial judge take under advisement a motion to dismiss for plaintiff's alleged failure to respond to the Request to Produce. No attempt was made by the airline to continue the trial because of its alleged inability to examine the documents.

The question before us, then, is whether the trial judge abused his discretion in not dismissing the action. "The sanctions available to a trial judge under Fed.R.Civ.P. are discretionary and the imposition of such sanctions will not be reversed unless there has been an abuse of discretion." *Fox v. Studebaker-Worthington, Inc.,* 516 F.2d 989, 993 (8th Cir. 1975). We find that the district judge did not abuse his discretion in not imposing any sanctions for plaintiff's failure to produce medical records which were no longer in existence. Where the failure to comply with a discovery order is due to inability, and not to willfulness, bad faith, or any fault of a party, the claim of that party should not be dismissed. *Societe Internationale Pour Participations Industrielles Et Commerciales v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).

For the reasons stated above, the judgment of the district judge is affirmed.