Edwin D. **WOLF** et al., Appellants,

v.

**TRANS WORLD AIRLINES, INC.** and **Flying Mercury, Inc.,** Appellees.

No. 76–1055.

United States Court of Appeals, Third Circuit.

Argued Sept. 9, 1976.

Decided Oct. 14, 1976.

---

**28.** *Id.* at 44–45.

Robert B. Wolf, Burton Caine, Philip L. Lustbader, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellants.

Robert M. Landis, Gregory D. Keeney, Dechert, Price & Rhoads, Philadelphia, Pa., for appellees.

Before VAN DUSEN, HUNTER and WEIS, Circuit Judges.

JAMES HUNTER, III, Circuit Judge:

This is an appeal from the district court's order dismissing plaintiffs' action on the basis of our opinion in *Polansky v. Trans World Airlines, Inc.*, 523 F.2d 332 (3d Cir. 1975). The instant case raises an issue not presented in *Polansky*, but we affirm nevertheless.

## I.

Plaintiffs-appellants were participants in Trans World Airlines (TWA) "Mini-Plans" in 1971 and 1972. Each "Mini-Plan" involved a flight to a European city, hotel accommodations, a rental car, and other ancillary services, all for one discount fare. Under the applicable tariff, the Civil Aeronautics Board conditioned its approval of the discount air fare on TWA's pledge to provide each tour participant with sleeping accommodations for the entire trip. The advertisement for each Mini-Plan specified the city that was to be the focus of the tour, the types of cars and sightseeing packages offered, and the availability of lodging. For example, the London Mini-Plan cost $337 per person; it included round-trip air fare (New York to London), one night's lodging at a hotel and twelve nights at a guest house in Dumfries, a car with unlimited mileage, and a "Getaway Hotel Pass and Discount Card." More detailed brochures and subsequent communication from TWA revealed to participants that the guest house vouchers would be invalid for their entire stay if not presented at their particular hostelry before 6:00 p. m. on the date of their arrival in Europe.

Only after arrival in Europe did the participants discover that their guest houses were not located in suburbs of the arrival cities, but were instead so far away that it was impractical to arrive at the guest houses before 6:00 p. m. on the dates their flights touched down. Dumfries, for example, turned out to be a Scottish town some 350 miles from London.[1] As a result, all plaintiffs were forced to forfeit the free guest house accommodations and fend for themselves.

Upon complaints from various participants, the CAB issued a cease and desist order, directing TWA, among other things, to describe properly the restrictions imposed upon availability of the offered lodging and to state expressly the distance from arrival city to guest house, if greater that 60 miles. Before the issuance of that order, plaintiffs instituted against TWA a class action for private damages in the Eastern District of Pennsylvania. Plaintiffs contended that the Mini-Plan advertisements were deceptive, inasmuch as they caused plaintiffs to believe that the towns in which their guest houses were located were near the tour cities. They asserted rights of recovery under sections 403(b) and 411 of the Federal Aviation Act, 49 U.S.C. §§ 1373(b), 1381. After discovery had begun, the district court *sua sponte* raised the question of subject matter jurisdiction. On November 7, 1975, the court dismissed plaintiffs' federal claims on the basis of *Polansky, supra.* The court also dismissed their pendent state claims. Plaintiffs appeal from that order.

## II.

In *Polansky,* we held that § 411[2] of the Federal Aviation Act gives rise to no implied private right of action. We need not repeat all that we said there. It is sufficient to note that *Polansky* forecloses plaintiffs' attempt to discover an implied remedy within § 411 in this case.

---

1. The distances between tour city and guest house site varied from a low of 185 miles (Zurich, Switzerland to Nauders, Austria) to a high of 480 miles (Athens to Karola, Greece).

   There is some indication that TWA devised the Mini-Plans knowing that the participants would never be able to avail themselves of the free lodging offer, as a means of securing CAB approval of the discount air fare without having to provide the sleeping accommodations required by the tariff.

2. § 411, 49 U.S.C. § 1381, reads as follows:

   The Board may, upon its own initiative or upon complaint by any air carrier, foreign air carrier, or ticket agent, if it considers that such action by it would be in the interest of the public, investigate and determine whether any air carrier, foreign air carrier, or ticket agent has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof. If the Board shall find, after notice and hearing, that such air carrier, foreign air carrier, or ticket agent is engaged in such unfair or deceptive practices or unfair methods of competition, it shall order such air carrier, foreign air carrier, or ticket agent to cease and desist from such practices or methods of competition. Pub.L. 85–726, Title IV, § 411, Aug. 23, 1958, 72 Stat. 769.

Plaintiffs also raise a claim under § 403(b) of the Act. *Polansky* did not deal with that section, but the result here is the same: there is no implied private right of action.

Section 403(b), 49 U.S.C. § 1373(b), provides in pertinent part as follows:

No air carrier or foreign air carrier or any ticket agent shall charge or demand or collect or receive a greater or less or different compensation for air transportation, or for any service in connection therewith, than the rates, fares, and charges specified in then currently effective tariffs of such air carrier or foreign air carrier; and no air carrier or foreign air carrier or ticket agent shall, in any manner or by any device, directly or indirectly, or through any agent or broker, or otherwise, refund or remit any portion of the rates, fares, or charges so specified, or extend to any person any privileges or facilities, with respect to matters required by the Board to be specified in such tariffs except those specified therein.

Plaintiffs allege, and TWA does not deny, that TWA received a higher price for the services provided than that specified in the tariff, because the tour participants were in fact unable to use the sleeping accommodations. Plaintiffs rightly contend that terms required by the tariff become part of the contract between passengers and carrier, even though not expressly mentioned. *Lichten v. Eastern Airlines, Inc.*, 87 F.Supp. 691 (S.D.N.Y.1949), *aff'd* 189 F.2d 939 (2d Cir. 1951); *accord, Tishman & Lipp, Inc. v. Delta Air Lines*, 413 F.2d 1401, 1403 (2d Cir. 1969). This does not mean, however, that a breach of that contract, which happens to involve deviation from the tariff, gives rise to a private remedy under § 403(b).

We reach this conclusion by following the analysis set forth in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In deciding whether a private remedy is implicit in § 403(b), we must first determine whether plaintiffs are members of that class for whose especial benefit the statute was enacted. *Id.* Plaintiffs here are not the special beneficiaries of § 403(b). That section prohibits the charging of fares either higher or lower than those established by the tariff. Yet a passenger could claim to be injured only by a higher charge. Because § 403(b) proscribes violations of the tariff that inure to passengers' benefit as well as to their detriment, we conclude that § 403(b) could not have been passed especially for the benefit of those in plaintiffs' position. Thus, TWA's violation of the tariff, which is the object of the section's ban, was merely incidental to the contractual claim presented by plaintiffs. That is, plaintiffs allege that they were promised lodgings that they could not, for all practical purposes, obtain. Because the tariff also required those lodgings to be provided, TWA's breach of promise amounted to deviation from the tariff as well. But if a carrier specifically contracted with a group of passengers to furnish carriage and other services at a cost *below* the tariff rate, and then did so, the carrier would not break its contract; however, it would violate the tariff. Yet surely the passenger, suffering no injury, would have no right of action under § 403(b).

Moreover, aggrieved passengers do not need protection from § 403(b). It is enough that the tariff provisions implicitly form part of the contract of carriage. When this contract is broken, an action in contract will lie; no special protection, couched in terms of tariff violations, is needed. Thus, it is evident that § 403(b) does not specially protect a class of which plaintiffs are members. Instead, it was designed to empower the CAB to control the supposedly pernicious competitive activities that were the target of the Federal Aviation Act. *See Polansky, supra*, 523 F.2d at 336–37. That is the only plausible reason for its proscription of fares below, as well as above, the tariff levels.

Even if plaintiffs could pass this first step in the *Cort* analysis, they would still not meet the third *Cort* requirement

for the implication of a private remedy,[3] that the private remedy be consistent with the purposes of the legislative scheme. *Cort, supra,* 422 U.S. at 78, 95 S.Ct. 2080. The policy of the Act, as we stated in *Polansky,* is the promotion of efficient air service at reasonable charges, without unjust discriminations, undue preferences, or unfair or destructive competition. 523 F.2d at 336–37. To that end, the Act created the CAB, which is to control all facets of the airline industry. *Id.* at 339. Permitting private suits under § 403(b) in situations where the CAB has found no tariff violation would undermine agency discretion, *id.*; permitting private suits in cases—like this one—where the agency has already issued a cease and desist order is unnecessary to further the purposes of the Act, which deals with the health of the airline industry, not with remedies for breach of contract.

 The fourth step of the *Cort* analysis involves determining whether the cause of action is one traditionally relegated to state law, so that implication of a federal cause of action would be inappropriate. *Cort, supra,* 422 F.2d at 78. Under this guideline, we reach the conclusion arrived at in *Polansky*:

> Within the terms of the *fourth Cort* test, it would be entirely appropriate to relegate these appellants to whatever remedy has been created by state law. As the premise of this discussion, we recognize that a state remedy for breach of contract, breach of warranty and fraudulent misrepresentation was and, perhaps still is, readily available. Only where there is some countervailing national interest should the federal courts imply a federal private remedy when an adequate state remedy already exists. No countervailing national interest has been brought to the attention of the court in this case.

523 F.2d at 337. In the case *sub judice,* there has been no showing that a state contract or misrepresentation action would not lie.

For the foregoing reasons, the district court's dismissal of the action will be affirmed for failure to state a cause of action.

---

**3.** The second step in the *Cort* analysis involves an investigation of legislative intent with respect to the availability *vel non* of private remedies. As we noted in *Polansky,* the Federal Aviation Act and its legislative history offer little illumination in this area. 523 F.2d at 336.