**I. C. BRUNWASSER, Plaintiff,**

v.

**TRANS WORLD AIRLINES, INC., Defendant.**

Civ. A. No. 81–1162.

United States District Court, W. D. Pennsylvania.

June 29, 1982.

---

Allen N. Brunwasser, Pittsburgh, Pa., for plaintiff.

Jeffrey S. Blum, Thorp, Reed & Armstrong, Pittsburgh, Pa., for defendant.

## OPINION

WEBER, Chief Judge.

In January of 1981, Trans World Airlines, Inc. (TWA) began a promotional campaign in the Pittsburgh market. In this campaign TWA advertised non-stop, economical air service from Pittsburgh to London, England, beginning on May 18. This service was designed to provide daily non-stop air connections between these two cities. In order to obtain this special service passengers were required to purchase their tickets by March 15, 1981. This service was subject to several limitations and the offer was scheduled to expire on September 14.

On February 6, 1981, the plaintiff in this action, Ina Brunwasser, and her father purchased two round trip tickets from TWA for this Pittsburgh to London service. Plaintiff was scheduled to depart for London on September 1, 1981 and return to Pittsburgh on September 8, 1981.

Following the plaintiff's purchase of these tickets TWA decided to suspend this special service, citing low yields on its off peak flights as the reason for its decision. As a result of this suspension of service some passengers holding tickets on non-stop flights from Pittsburgh to London had their flights cancelled. TWA contacted these passengers, including the plaintiff, and offered them three alternatives to the daily non-stop flights previously provided. Passengers holding tickets on one of these cancelled flights could, at no additional cost: (1) take a non-stop flight from Pittsburgh to London on another day; (2) travel from Pittsburgh to London on the date originally scheduled, but travel by way of New York; or (3) receive a refund of the purchase price of their tickets.

None of the alternatives offered by TWA were deemed acceptable by the plaintiff. Accordingly on July 12, 1981, Ina Brunwasser filed a complaint against Trans World Airlines, Inc. in the Court of Common Pleas of Allegheny County, Pennsylvania. One day later on July 13, 1981, the defendant removed this action to the United States District Court for the Western District of Pennsylvania.

Plaintiff's complaint in this case is styled as a class action.[1] The complaint proceeds in five counts, and alleges that the defendant's unilateral rescheduling of these flights violates the Warsaw Convention, 49 U.S.C. § 1502, note (Count I), and Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.S.A. 201–1 *et seq.* (Count II). Plaintiff also contends that the defendant's conduct constitutes a breach of its contract of carriage with her (Count III), and a fraudulent misrepresentation of the terms of this special offer (Count IV). To compensate her for these wrongs the plaintiff seeks compensatory and punitive damages, specific performance of her contract of carriage (Count V) and other injunctive relief. We have previously denied injunctive relief. *See also* 518 F.Supp. 1321.

This case is now before us on defendant's motion for summary judgment. For the reasons set forth below, we believe that the plaintiff's complaint fails to state a cause of action for either breach of contract or violation of the Warsaw Convention. Accordingly, Counts I and III of the plaintiff's complaint are dismissed.

In contrast, the plaintiff's claims under Pennsylvania statutory and common law are not subject to summary judgment dismissal at this time. The allegations made by the plaintiff in these counts of her complaint raise questions of fact regarding the defendant's intentions at the time this special offer was made, questions which cannot be resolved on this record. Therefore, with respect to Counts II and IV of the plaintiff's complaint, defendant's motion will be denied.

Having dismissed plaintiff's claims under the Warsaw Convention, we feel that this court no longer has subject matter jurisdiction over this dispute. Therefore, we will order this matter remanded to the Court of Common Pleas of Allegheny County for further proceedings.

In this country the relationship between air carriers and passengers is subject to regulation on several different levels. At the outset that relationship is a contractual one. Therefore, the rights and duties of passengers and carriers are defined by the terms of their private agreement. In addition, however, air transportation, and the dealings between air carriers and passengers, are subject to governmental control and regulation. This regulation takes two forms.

Initially, the rights and duties of carriers and passengers are set forth in the tariffs filed by the carrier with the Civil Aeronautics Board. Under federal law all air carriers are required to file tariffs with the Civil Aeronautics Board and maintain these tariffs available for public inspection. In these tariffs the carrier describes its rates, fares, and charges for all air transportation it provides. 49 U.S.C. § 1373. These tariffs may also include limitations on the lia-

---

1. Plaintiff persists in calling this "a class action". It has never been ordered as a class action in this court. This would make no difference in the rulings made herein. Plaintiff has never moved in this court for a determination of class action, by citing the numerosity of the class which would indicate the desirability of a class action. It is highly doubtful if the present plaintiff would qualify as a class representative. She is the dependent daughter of plaintiff's attorney, her ticket was purchased (together with his own) on his credit card. All through the arguments in this case plaintiff's attorney talked of his own inconvenience in having to change planes at Kennedy International Airport, his own fear of a stop there during the air controllers' strike, and his necessity of going to London on September 1 to avoid the consequences of the local hay fever season, to which he is notoriously subject. In all respects the named plaintiff is not shown to be the real party in interest or one who suffered any loss; the real party in interest is the named plaintiff's attorney and father and we would never declare this to be a class action under these circumstances. This is not a class action.

bility of the carrier; *Tishman & Lipp, Inc. v. Delta Airlines*, 413 F.2d 1401 (2d Cir. 1969), and impose other reasonable restrictions on air travel. The Civil Aeronautics Board reviews these proposed tariffs and, if it finds that any tariff is inconsistent with CAB policy, the Board is empowered to reject that tariff. Tariffs rejected by the Board are void. 49 U.S.C. § 1373(a).

■ Once a tariff is filed and approved by the CAB it becomes "conclusive and exclusive, and the rights and liabilities between airlines and their passengers are governed thereby." *Tishman & Lipp, Inc. v. Delta Airlines*, 413 F.2d at 1403; *Emery Air Freight Corp. v. United States*, 499 F.2d 1255, 1259 (Ct.Cl.1974); ("the tariffs on file with the CAB, if valid, are the controlling factor with respect to the services provided by the carrier.") Moreover the provisions of the tariff, once approved, become part of the contract of carriage between the airline and passengers, even if not expressly mentioned in the agreement itself. *Wolf v. Trans World Airlines, Inc.*, 544 F.2d 134, 137 (3d Cir. 1976); *Tishman & Lipp, Inc. v. Delta Airlines*, 413 F.2d at 1404. Therefore, these tariffs, along with the terms of the parties' private agreement, form the basis of the legal relationship between airlines and their passengers.

Tariffs are not the only form of government regulation defining the relationship between air carriers and passengers. When, as in this case, the parties are engaged in international air travel, the rights and duties of air carriers are set not only by contract and tariff but also by treaty.

The principle treaty governing international air travel is the Warsaw Convention, 49 U.S.C. § 1502 note. The Convention was drafted in the 1920's during the infancy of international air transportation. At that time it was felt that a uniform body of law governing international air transportation was necessary in order to create an atmosphere favorable to the development of this industry. *See, Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1258 (2d Cir. 1977); *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152, 155 (3d Cir. 1977).

In order to create this atmosphere the Convention standardized transportation documents for all international flights; Articles 3–16, defined the duties of air carriers to their passengers; Articles 17–20, and established limitations on recoverable damages in cases involving injuries resulting from international flights. Articles 20, 22 and 23.

In this case the plaintiff alleges that TWA's decision to discontinue its daily non-stop service from Pittsburgh to London was both a breach of contract and a violation of the Warsaw Convention. We disagree. Accordingly, we will grant the defendant's motions for summary judgment with respect to Counts I and III of the plaintiff's complaint.

Turning initially to the plaintiff's breach of contract claim, the terms of this contract of carriage are set forth in writing on the ticket issued by TWA to the plaintiff. The terms of this agreement are clear and unambiguous. Because the agreement between these parties is embodied in an unambiguous written instrument, its interpretation presents a question of law. *See, Hewes v. McWilliams*, 412 Pa. 270, 194 A.2d 339 (1963). Similarly the interpretation of TWA's tariffs, which also form part of this agreement, presents a question of law for the court. *Emery Air Freight Corp. v. United States*, 499 F.2d at 1259. Accordingly these issues are properly before the court on defendant's motion for summary judgment. *See, Fed.R.Civ.P. 56.*

The written contract between the plaintiff and TWA unambiguously provides that "times shown in time table or elsewhere are not guaranteed and form no part of this contract. Carrier may without notice substitute alternate carriers or aircraft, and may alter or omit stopping places shown on the ticket in case of necessity. Schedules are subject to change without notice. Carrier assumes no responsibility for making connections." (paragraph 9). The contract goes on to state that "no agent, servant or representative of [TWA] has authority to alter, modify or waive any provision of this contract." (paragraph 11). The agreement also expressly subjects air transportation

with TWA to the terms and conditions set forth in that carrier's tariffs.

Two of these tariff provisions are particularly relevant here. The first is Rule 85 of the tariffs which states that "times shown in time tables or elsewhere are approximate and not guaranteed, and form no part of the contract of carriage. Schedules are subject to change without notice and carrier assumes no responsibility for making connections. Carrier will not be responsible for errors or omissions either in time tables or other representations of schedules. No employee, agent or representative of carrier is authorized to bind carrier by any statements or representation as to the dates or times of departure or arrival, or of the operation of any flight." Rule 85(A). This tariff further provides that "carrier undertakes to use its best efforts to carry passenger and baggage with reasonable dispatch, but no particular time is fixed for the commencement or completion of carriage. Subject thereto, carrier may, without notice, substitute alternate carriers or aircraft and may alter or omit stopping places shown on the face of the ticket in case of necessity." Rule 85(B)(1).

In addition the contract between the plaintiff and defendant was subject to International Passenger Rules Tariff number IPR–2. This tariff describes the responsibility of a carrier to its passengers "in the event [the] carrier cancels a flight, fails to operate according to schedule, fails to stop at a point to which the passenger is destined or is ticketed to stop over [or] substitutes a different type of equipment or class of service...". In such instances the carrier is obliged to either:

(1) carry the passenger on another of its passenger aircraft on which space is available without additional charge regardless of the class of service, or

(2) endorse to another carrier or other transportation service, the unused portion of the ticket for purposes of rerouting; or

(3) reroute the passenger to the destination named on the ticket or applicable portion thereof by its own or other transportation services; and, if the fare, excess baggage charges, and any applicable service charge for the revised routing or class of service is higher than the refund value of the ticket or applicable portion thereof as determined by Rule 90D, carrier will require no additional payment from the passenger, but will refund the difference if it is lower.

█ Given these unambiguous provisions of both the contract of carriage and the applicable tariffs, we feel that plaintiff's breach of contract claim must fail. Essentially what TWA did in this case was suspend its daily non-stop flight from Pittsburgh to London. As a result of this suspension of service some TWA flights were canceled and passengers holding tickets on those flights were rescheduled on other TWA flights. This rescheduling was done in such a way that it provided passengers with the option of same day, one stop service to London; a non-stop flight with TWA to London departing on some other day; or a refund of the passenger's ticket purchase price.

None of the terms of the contract between the plaintiff and defendant prohibit TWA from offering passengers these reasonable alternatives to its originally advertised service. Quite the contrary that agreement expressly indicates that advertised time tables are not part of the contract of carriage. The agreement also authorizes TWA to make changes in scheduled service without prior notice to passengers.

Moreover, this rescheduling of service is, in our view, totally consistent with the applicable tariff limitations. These tariffs unambiguously state that "times shown in time tables or elsewhere are approximate and not guaranteed, and form no part of the contract of carriage." They also permit the airline to revise its flight schedule without notice to passengers.

In the event of schedule changes the tariffs require that the carrier reroute its passengers to their destinations at no extra charge. In this case TWA provided all affected passengers with alternate air transportation to London at no additional

charge. Therefore, TWA's action seems wholly in accord with the controlling air tariffs. Because the actions taken by TWA in this case violate neither the terms of the written contract of carriage, nor the applicable air tariffs we conclude that the plaintiff has failed to state a cause of action for breach of contract. Accordingly, Count III of the plaintiff's complaint must be dismissed.

Plaintiff also argues in Count I of her complaint that this rescheduling of her Pittsburgh to London flight violates the Warsaw Convention. In support of this contention, plaintiff refers to Articles 3 and 19 of that treaty, which she asserts proscribe the unilateral rescheduling of international flights. Because we feel that neither of these provisions provides a basis for liability against TWA in this case, we will dismiss this count of plaintiff's complaint.

■■■ Defining the scope of the Warsaw Convention presents a question of treaty interpretation. It is the responsibility of the court to interpret international treaties and determine the domestic rights and duties established by them. *United States v. Decker*, 600 F.2d 733, 737 (9th Cir. 1979), *cert. denied* 444 U.S. 855, 100 S.Ct. 113, 62 L.Ed.2d 73 (1979). Because treaty interpretation is purely a question of law, it may appropriately be considered by the court on a motion for summary judgment. *Upton v. Iran National Airlines, Inc.*, 450 F.Supp. 176, 177, 178 (S.D.N.Y.1978). Treaty interpretation begins, of course, with a consideration of the language of the treaty itself. It is clear, however, that in construing the treaty we should also consider the history of the negotiations surrounding the treaty and the intent of the treaty's signatories. *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 35–36 (2d Cir. 1975); *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 336–338 (5th Cir. 1967). Thus in construing the treaty we should strive to determine the intent of the parties and interpret the language of the treaty in a manner which is consistent with that intent.

■■ Applying these standards we feel, at the outset, that it is clear that Article 3 of the Warsaw Convention provides no basis for liability against TWA. That section of the treaty simply describes the particulars which a passenger ticket must contain. *See*, Article 3(1)(a), (b) (d), (e). It does not purport to impose any direct liability on international air carriers. Nor does it anyway proscribe the actions taken by TWA in this case. Quite the contrary, Article 3 provides that a carrier may, when necessary, reserve the right to alter the stopping places on an international flight, as long as that alteration does not deprive the flight of its international character. Article 3(1)(c). Thus Article 3 of the Warsaw Convention specifically contemplates and condones the type of scheduling change made by the defendant in this case. Since that change in no way would have deprived plaintiff's flight of its international character Article 3 of the Warsaw Convention cannot serve as a basis for liability in this case.

In contrast to Article 3, Article 19 of the Warsaw Convention does impose direct liability on carriers engaged in international air transportation. Article 19 is one of several sections of the convention which describe and limit the liability of international air carriers. That article provides that a carrier "shall be liable for damage occasioned by the delay in the transportation by air of passengers, baggage or goods."

The critical phrase in this article is "damage occasioned by delay in the transportation by air...". This phrase defines the scope of this article and, therefore, sets the limits on a carrier's liability under the Convention. Accordingly, Count I of the plaintiff's complaint states a cause of action under the Convention only if the plaintiff has been damaged by a delay "in the transportation by air."

This phrase is not defined in the text of Article 19 itself. We feel, however, that this language should be construed narrowly. In our view this strict construction is mandated not only by the express terms of the Convention; but also by the judicial construction given those terms and by the policies underlying this treaty.

Article 19 is one of a number of treaty provisions relating to the liability of international air carriers. Together these provisions form a comprehensive body of law, which describes the rights and duties of both airlines and passengers. Two of these treaty provisions, Articles 18 and 19, limit carrier liability to damages occasioned by "transportation by air". Article 19 does not describe what meaning should be given this phrase. However, the companion section of the Convention, Article 18, does discuss what transportation by air entails. Article 18, which deals with airline liability for lost or damaged baggage, defines transportation by air in the following terms: "The transportation by air within the meaning of [this article] shall comprise the period during which the baggage or goods are in the charge of the carrier, whether in an airport or on board an aircraft, . . . . The period of transportation by air shall not extend to any transportation by land, by sea, or by river performed outside an airport. . ." Articles 18(2) and (3). We see no reason why this description should not apply with equal force to Article 19 of the Convention. Moreover we feel that this description demonstrates that the term "transportation by air" is narrowly defined in the Warsaw Convention to encompass only those activities which are directly associated with the movement of goods and people through the air.

This narrow view of the scope of the Warsaw Convention has also been adopted by those courts which have had occasion to consider the liability provisions of this treaty. These courts generally concede that, for liability to be premised on the Warsaw Convention, "there should . . . be a close logical nexus between the injury and air travel per se." *Martinez-Hernandez v. Air France*, 545 F.2d 279, 284 (1st Cir. 1976), *cert. denied* 430 U.S. 950, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977), (construing Article 17 of the Warsaw Convention). Determining what constitutes a sufficient nexus between injury and air travel to give rise to liability under the Warsaw Convention typically involves consideration of three factors. These are: "[the] location of the accident, the activity in which the injured person was engaged [at the time of accident], and the control by the defendant of such injured person . . . at the time of the accident. . .". *Evangelinos v. Trans-World Airlines, Inc.*, 550 F.2d 152, 155 (3d Cir. 1977); *E. G. Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256 (2d Cir. 1977); *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir. 1975).[2] Applying these standards courts have limited the coverage of the Convention to instances in which the plaintiff's injuries were closely related to the actual flight itself. *See, e.g. Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256 (2d Cir. 1977), (passenger injured in hallway between Air France gate and main terminal building, held no liability under Warsaw Convention); *McDonald v. Air Canada*, 439 F.2d 1402 (1st Cir. 1971), (passenger injured in baggage area, held no liability under Warsaw Convention); *Upton v. Iran National Airlines Corp.* 450 F.Supp. 176 (S.D.N.Y.1978), (passenger injured in terminal building, held no liability under Warsaw Convention).

Finally, construing these liability provisions narrowly is consistent with the policies underlying this treaty. As we have previously noted, the Warsaw Convention was drafted during the infancy of international air travel. The intent of the drafters of the Convention was to establish an atmosphere conducive to the development of in-

---

**2.** These cases all involve Article 17 of the Warsaw Convention which imposes liability on air carriers in the event of the death, wounding or injury of a passenger occurring on board an aircraft or in the course of embarking or disembarking. Article 17 does not contain the phrase "transportation by air". However, the policies underlying Articles 17 and 19 of the Convention are identical. Moreover applying similar standards of review to these closely related treaty provisions promotes uniformity of decision in this area of the law. *See, Evangelinos v. Trans-World Airlines, Inc.*, 550 F.2d at 155; *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 337 (5th Cir. 1967). Therefore we feel that the standards employed in determining liability under Article 17 provide an adequate guidepost for the evaluation of claims arising under Article 19 of the Convention.

ternational air travel. In order to promote this goal the Convention imposed strict limitations on the liability of international air carriers.

In interpreting the Convention we must recognize and give effect to this policy determination made by its signatories. We believe that an interpretation of this treaty which limits liability to injuries which are directly related to international flights serves to promote this policy. Therefore we will adopt such an interpretation in the instant case.

■ In her complaint the plaintiff alleges that TWA's rescheduling of her Pittsburgh to London flight resulted in a "delay in the transportation by air." This unilateral flight rescheduling forms the basis of plaintiff's claim of violation of the Warsaw Convention. We feel, however, that the plaintiff has not demonstrated the type of close logical nexus between her injury and an international air flight necessary to liability under Article 19 of the Convention.

The plaintiff purchased her ticket with TWA in February of 1981. At that time her scheduled departure date was September 1. The plaintiff was notified by TWA of the change in her flight schedule sometime on or before June 4, 1981.[3] This is some three months prior to the date she was to depart from Pittsburgh. At this time the plaintiff was not engaged in air travel per se. In fact, the acts complained of by the plaintiff occurred long before she was to engage in any air travel with the defendant. Moreover at this time TWA did not exercise any significant control over the actions of the plaintiff. Quite the contrary plaintiff was free to accept the alternate air service to London offered by the defendant or demand a refund of her ticket purchase price and make her own air connections with another carrier. Since the actions of TWA were remote in time and place from any actual flight, we conclude that they do not fall within the limited scope of Article 19 of the Warsaw Convention. Accordingly, Count I of the plaintiff's complaint which alleges a violation of this treaty, must be dismissed.

In Counts II and IV of her complaint the plaintiff alleges that TWA's conduct violates Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.S.A. § 201-1 et seq. and constitutes a fraudulent misrepresentation of the terms of this special offer. Defendant now moves to dismiss these counts of the plaintiff's complaint alleging that they are pre-empted by federal law and that the plaintiff cannot, as a matter of law, recover under either count. We disagree. Accordingly, we deny defendant's motions as to these counts.

At the outset, we find defendant's argument that federal law has pre-empted this field unpersuasive. While federal regulation of air travel is extensive; it is not exclusive. Quite the contrary federal law specifically preserves legal remedies for air travelers beyond those set forth in the Federal Aviation Act. 49 U.S.C. § 1506 provides that: "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

■ This section recognizes that the statutory scheme established by the Federal Aviation Act is designed merely to complement existing statutory and common law remedies, not to supplant them. Moreover, it is clear that 49 U.S.C. § 1506 applies to remedies arising under state law as well as those created by federal law. E.g. *In re; Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975*, 635 F.2d 67, 74–75 (2d Cir. 1980); *Porter v. Southeastern Aviation, Inc.*, 191 F.Supp. 42 (M.D.Tenn.1961); *See, Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 298–300, 96 S.Ct. 1978, 1984–1985, 48 L.Ed.2d 643 (1975),

---

**3.** We can determine this date from the progress of plaintiff's lawsuit. The plaintiff filed a praecipe for a writ of summons in class action in the Court of Common Pleas of Allegheny County on June 4, 1981. In this praecipe the plaintiff set forth the charges which now form the basis of this lawsuit. Therefore, plaintiff must have received notice of her scheduled change on or before June 4, 1981.

(common law fraud claims not pre-empted by Federal Aviation Act). Therefore, plaintiff's claims under both the common law of Pennsylvania and the Pennsylvania Unfair Trade Practices and Consumer Protection Law would remain unaffected by this federal regulation of air travel.

Nor do we feel that the plaintiff has failed, as a matter of law, to state a cause of action in Counts II and IV of her complaint. In these counts of her complaint the plaintiff focuses on the advertising campaign conducted by TWA in connection with this special Pittsburgh to London offer. The plaintiff alleges that TWA never intended to operate its non-stop Pittsburgh to London service as advertised. According to the plaintiff TWA offered this service simply in order to induce individuals to purchase tickets through TWA. The airline then re-routed these passengers to London on less desirable connections. This, the plaintiff argues, constitutes a fraudulent trade practice which violates both Pennsylvania statutory and common law.

■ In our view the allegations presented in these counts of the plaintiff's complaint clearly raise issues of fact, issues which cannot be resolved through defendant's motion for summary judgment. One of the central questions presented by these allegations deals with the intent of the defendant when this offer was first made. If TWA advertised daily non-stop service to London, knowing that no such service would be provided, then their actions may indeed be fraudulent and give rise to liability at statute and at common law. Therefore we cannot say, as a matter of law, that the plaintiff has failed to state a cause of action in Counts II and IV of her complaint.

The defendant argues, however, that the claims of fraud found in Counts II and IV of the plaintiff's complaint are nothing more than a restatement of the plaintiff's prior argument that TWA breached its contract of carriage and violated applicable tariffs when it canceled her flight. According to the defendant this is essentially the same claim made by the plaintiff in Count I of her complaint and in objections which she has filed with the Civil Aeronautics Board. The defendant contends, therefore, that Counts II and IV of the plaintiff's complaint should be either dismissed or stayed pending consideration of this matter by the CAB.

■ We disagree. In our view a distinction can be drawn between Counts I and III and Counts II and IV of the plaintiff's complaint. In Counts I and III of her complaint the plaintiff challenges the manner in which TWA provided air service to her. In contrast Counts II and IV of the plaintiff's complaint focus on the manner in which TWA advertised this air service. These are, in our view, two distinct issues. TWA may provide a service which is wholly in accord with all applicable air tariffs yet still be liable to passengers if it has advertised that service in a misleading or deceptive manner. Therefore, we would not stay or dismiss these claims of fraud pending action by the Civil Aeronautics Board. *See, Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1975).

Finally defendant contends that the plaintiff cannot maintain a cause of action under the Pennsylvania Unfair Trade Practices and Consumer Protection Law. Under this act an individual may bring a private action only if he suffers some "ascertainable loss of money or property" as a result of an unfair trade practice. *See,* Pa.S.A. § 201–9.2(a). According to the defendant, the plaintiff cannot show any ascertainable loss of money or property as a result of her dealings with TWA. Therefore her claims under the Pennsylvania Consumer Protection Act should be dismissed.

This point requires little discussion. The Pennsylvania Unfair Trade Practices and Consumer Protection Law is a broad remedial act designed to protect consumers from a wide range of fraudulent and deceptive trade practices. *See, Commonwealth by Packel v. Ziomek*, 352 A.2d 235 (Commonwealth Court, 1976). Since the consumer protection law is designed to thwart a broad spectrum of consumer frauds, it should be construed liberally. Such a liberal construction is necessary in order to give effect

to the objectives underlying this act. *Commonwealth by Creamer v. Monumental Properties, Inc.*, 459 Pa. 450, 329 A.2d 812, 816–17 (1974).

The position urged by the defendant in this case runs contrary to this principal. The defendant asks us to take a narrow view of the term ascertainable loss and require that the plaintiff plead a specific ascertainable loss of money or property in order to maintain a cause of action under this act. Such an interpretation of this language would severely undercut the remedial framework established by this statute. It would, in effect, limit the class of plaintiffs to those individuals who could show specific liquidated damages as a result of an unfair trade practice.

We feel that the ascertainable loss requirement of this act is designed merely to insure that individuals bringing suit have in fact been damaged by a deceptive trade practice. In this case we feel that the plaintiff has pleaded sufficient facts to demonstrate an actual injury to herself. The plaintiff alleges that she and her father purchased two tickets with TWA as a result of TWA's advertisements offering a special non-stop Pittsburgh to London fare. Plaintiff further contends that she has never received the specific service advertised by TWA. Plaintiff argues that the advertisement which induced her to purchase these tickets was deceptive and misleading. Therefore, plaintiff has pleaded sufficient facts to demonstrate that she falls within the class of people injured by TWA's deceptive advertising. Accordingly, we believe that the plaintiff can maintain a private action under the Pennsylvania Unfair Trade Practice and Consumer Protection Law. 73 Pa.S.A. § 201–9.2(a).

Because the plaintiff has pleaded a set of facts which could sustain a valid cause of action under Pennsylvania statutory and common law, we must deny defendant's motion for summary judgment on Counts II and IV of the plaintiff's complaint.

Having dismissed Counts I and III of the plaintiff's complaint we must now consider whether this court can retain jurisdiction over the remaining issues in this law suit. Federal district courts are courts of limited jurisdiction. In the exercise of this jurisdiction the district court is subject to statutory and constitutional constraints. Therefore, a district court may entertain jurisdiction over an action only within constitutional limits, and then only when such jurisdiction is expressly or impliedly granted to it by act of Congress. Moreover subject matter jurisdiction is a necessary prerequisite to any action brought in the federal court. Without such jurisdiction the district court is powerless to act.

Because subject matter jurisdiction goes to the very power of the court to hear a law suit we have an independent duty to determine that jurisdiction is properly vested with this court. We may, therefore, raise the question of subject matter jurisdiction on our own motion. *Louisville & Nashville Railroad v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908); *see*, 1 Moore's Federal Practice ¶ 0.60[4] at 628–630 (1982).

Generally speaking federal district courts have subject matter jurisdiction over two types of disputes. The first ground of federal jurisdiction consists of cases arising under the constitution, laws and treaties of the United States. This is typically referred to as federal question jurisdiction. In addition the district court has jurisdiction over disputes between citizens of two or more different states. Federal jurisdiction founded on diversity of citizenship is limited by statute, however, to cases "where the matter in controversy exceeds the sum or value of $10,000 exclusive of interest and costs ...". 28 U.S.C. § 1332(a).

In this case we feel that the action we take today eliminates federal question jurisdiction as a basis for the removal of the plaintiff's complaint from state court. As we read plaintiff's complaint only Count I, which alleges a violation of the Warsaw Convention, clearly states a cause of action arising under the laws or treaties of the United States. We have concluded above that there is no merit to this count of the plaintiff's complaint. Accordingly our dismissal of Count I of the plaintiff's com-

plaint divests this court of any federal question jurisdiction in this matter.[4]

Nor do we feel that this court can retain jurisdiction over this case on the basis of diversity of citizenship. At the outset we note that diversity was not pleaded by the defendant as a ground for the removal of this case. Nor does the plaintiff's complaint, on its face, reveal that the plaintiff and defendant are residents of different states. In fact, none of the pleadings filed in this matter reflect the diversity of citizenship necessary for the exercise of jurisdiction by this court.

But even if the plaintiff and defendant were residents of different states, this fact alone would not justify the exercise of jurisdiction by this court. Federal diversity jurisdiction extends only to those cases where the amount in controversy exceeds $10,000. 28 U.S.C. § 1332. In this case we do not believe that the plaintiff can demonstrate damages sufficient to meet this jurisdictional threshold.

In her complaint the plaintiff claims both actual and punitive damages. At the outset we question whether plaintiff can prove any damage at all in the face of the reasonable alternatives offered by TWA at the time of this schedule change. But even if we assume that the plaintiff could prove some actual damages in this case, those damages would be limited to the purchase price of her ticket, $499. Plaintiff has not pleaded any facts which would support a further award of compensatory damages and, in fact, she is precluded by TWA's tariffs from seeking any further compensatory damages. Therefore the plaintiff's actual damages in this matter would fall far short of the amount required for the exercise of federal jurisdiction.

The plaintiff's complaint also contains a prayer for punitive damages. While punitive damages may be considered in determining whether a claim meets the jurisdictional threshold, a trial court is not compelled to accept a claim of punitive damages made to confer federal jurisdiction. *Zahn v. International Paper Co.*, 469 F.2d 1033–34, n.1 (2d Cir. 1972); *Gray v. Occidental Life Ins. Co. of California*, 387 F.2d 935 (3d Cir. 1968); *Ehrenfeld v. Webber*, 499 F.Supp. 1283, 1292 (D.Me.1980). Rather the district court has wide discretion in evaluating punitive damage claims which provide a basis for federal jurisdiction.

In this case we do not believe that the plaintiff's claim of punitive damages is sufficient to support the exercise of jurisdiction by this court. The remaining counts of the plaintiff's complaint allege that TWA engaged in fraudulent trade practices in violation of Pennsylvania statutory and common law. With respect to the statutory claim, the Pennsylvania Unfair Trade Practice and Consumer Protection Law defines the limits on recoverable damages. That section permits recovery of "actual damages or $100, whichever is greater." The act then authorizes the court to "award up to three times the actual damages sustained" in appropriate cases. 73 Pa.S.A. § 201–9.2(a). In this case even if we trebled the plaintiff's actual damages of $499 we would still fall far short of the amount necessary for federal diversity jurisdiction. Therefore, this statutory claim, by itself, is insufficient to establish federal jurisdiction in this matter.

As for the plaintiff's common law fraud claim, under Pennsylvania law the mere

---

4. Admittedly the plaintiff refers to certain sections of the Federal Aviation Act in Count II of her complaint. 49 U.S.C. §§ 1373, 1374 and 1381. We do not feel, however, that this passing reference to a federal statute is sufficient to confer federal question jurisdiction on this count. As we understand it Count II of the plaintiff's complaint alleges a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law. It does not purport to state a cause of action arising under federal law. Moreover, we note that at least two of the federal statutory provisions cited by the plaintiff do not provide for any private right of action against an air carrier. *See, Wolf v. Trans-World Airlines, Inc.*, 544 F.2d 134 (3d Cir. 1976), *cert. denied* 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977) (no private right of action under 49 U.S.C. § 1373); *Polansky v. Trans-World Airlines, Inc.*, 523 F.2d 332 (3d Cir. 1975). (no private right of action under 49 U.S.C. § 1381). Therefore, these sections could not provide an independent basis for the assertion of federal jurisdiction in this case.

allegation of fraud is not sufficient to justify an award of punitive damages. *Golomb v. Korus*, 261 Pa.Super. 344, 396 A.2d 430 (1978). Such damages are recoverable only upon a showing of extreme aggravating circumstances. *Long v. McAllister*, 275 Pa. 34, 118 A. 506 (1922). Moreover when punitive damages are sought from a corporation as a result of conduct of its agents and employees, that conduct must be clearly outrageous in order to justify an award. *Skeels v. Universal C.I.T. Credit Corporation*, 335 F.2d 846, 852 (3d Cir. 1964), (applying Pennsylvania law). Pennsylvania law also requires that punitive damages bear a reasonable relationship to actual damages. Therefore, an award of punitive damages cannot be disproportionate to compensatory damages. *Golomb v. Korus*, 261 Pa.Super. 344, 396 A.2d 430 (1978); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979).

In this case we feel that the plaintiff's compensatory damages can amount to no more than $499. Therefore, in order for the plaintiff to meet the jurisdictional threshold, we would have to conclude that she was entitled to punitive damages of more than $9,500. This we cannot do. Given the very limited scope of the plaintiff's actual loss in this case, we feel that an award of punitive damages sufficient to meet the federal jurisdictional requirements would be grossly disproportionate. Therefore, such punitive damages would not be recoverable under Pennsylvania law.

Finally we do not feel that the doctrine of pendant jurisdiction justifies any further consideration of the remaining counts of the plaintiff's complaint. Admittedly a federal district court has broad discretion to consider pendant state law claims when those claims are intimately related to a cause of action properly brought in federal court. This discretion is not unlimited, however. In exercising this discretion it is clear that "if it appears that the federal claim is subject to dismissal under Fed.R. Civ.P. 12(b)(6) or could be disposed of on a motion for summary judgment under Fed. R.Civ.P. 56, then the court should ordinarily refrain from exercising [pendant] jurisdiction ...". *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir. 1976); *Lechtner v. Brownyard*, 679 F.2d 322 (3d Cir. 1982).

 In this case we have disposed of the federal claims raised by the plaintiff's complaint on defendant's motion for summary judgment. Therefore we should not continue to exercise jurisdiction over these pendant state claims.

Because our resolution of defendant's motion for summary judgment divests this court of any subject matter jurisdiction in this action, we feel that this matter must be remanded to the Court of Common Pleas of Allegheny County for further proceedings.

An appropriate order will issue.